KUTTROFF, PICKHARDT & CO. (INC.) *v.* UNITED STATES (No. 2495) [1].

1. CONSTRUCTION, PARAGRAPH 28 AND SECTION 402 (f), TARIFF ACT OF 1922—RELATIVE TINCTORIAL STRENGTHS OF IMPORTED AND DOMESTIC COMPETITIVE DYES—AMERICAN SELLING PRICE.

The Board of United States General Appraisers having found that there was a domestic dye competitive with the imported dye at bar, and that five parts of the domestic dye accomplished the same results as four parts of the imported, their action in increasing the selling price of the domestic dye by 25 per centum and making that the appraised value was in accord with paragraph 28 and section 402 (f), Tariff Act of 1922, in the absence of any evidence as to whether or not it was the commercial practice to sell dyes in proportion to tinctorial strength.

2. CONSTRUCTION, PARAGRAPH 28, TARIFF ACT OF 1922—TESTS OF RELATIVE STRENGTHS OF DYES.

It being shown that the imported and domestic dyes were both commercially suitable for dyeing wool, it was correct to find their relative tinctorial strengths under paragraph 28, Tariff Act of 1922, by tests on wool, notwithstanding a showing that the chief use of the two dyes was for coloring paper and that tests on paper gave different relative strengths.

3. CLERICAL ERROR IN BOARD'S DECISION.

The Board of United States General Appraisers having fixed the appraised value erroneously, through an obvious error—clerical, typographical or other—its judgment is modified accordingly.

## United States Court of Customs Appeals, July 3, 1925

APPEAL from Board of United States General Appraisers, Reappraisement 13174–A

[Modified.]

*Barnes, Wilson & Halstead* (*Frank M. Halstead* of counsel) for appellant.

*Thomas J. Doherty* and *George F. Lamb* (*De Vries, Doherty, Davis & Lamb* of counsel), amici curiae.

*William W. Hoppin*, Assistant Attorney General (*J. G. Lerch*, special attorney, of counsel) for the United States.

[Oral argument Mar. 25, 1925, by Mr. Halstead, Mr. De Vries, and Mr. Lerch]

Before GRAHAM, Presiding Judge, and SMITH, BARBER, BLAND, and HATFIELD, Associate Judges

HATFIELD, Judge, delivered the opinion of the court:

This is an appeal from the judgment of the Board of General Appraisers in reappraisement 13174–A. The merchandise involved is an imported dye known as crystal violet, extra. It was entered at a value of $3 per pound and was appraised at $3.75 per pound. The importer appealed to reappraisement, and after an extensive hearing, the single general appraiser sustained the entered value. Upon appeal the Board of General Appraisers found from the evidence that the true value of the merchandise, based upon the Amer-

[1] T. D. 41054.

ican selling price of a similar competitive article produced in the United States, was $3.62 per pound, and the judgment of the single general appraiser was modified accordingly.

It is conceded by both parties to this appeal that the imported dye is competitive within the meaning of paragraph 28 of the Tariff Act of 1922 with a dye produced in the United States by Butterworth Judson Corporation known as crystal violet 6 B, which was freely offered for sale and sold at the time of exportation of the imported dye at $2.85 per pound, less 1 per centum for cash within 10 days from the date of sale.

It is conceded that, when used in the dyeing of wool or cotton yarns, four units of the imported dye accomplished results substantially equal to those accomplished by five units of the competitive domestic dye. The Government claims that the imported dye is therefore 125 per centum as strong as the domestic.

It is claimed by the appellant that neither the imported dye nor the domestic is commercially used in the dyeing of woolen or cotton yarns, but that each dye is chiefly used in the tinting of paper; that, when used in the tinting of paper, substantially equal results were secured with 110 units of the domestic as were secured with 100 units of the imported dye; and that the imported dye is therefore only 110 per centum as strong as the domestic.

The appellant further contends that, at the time the imported dye was exported from Germany, it was not the commercial practice in the United States to sell dyes which were similar except for differences in strength, "at prices varying with, dependent upon, or proportionate to such differences."

The brief of counsel for appellant contains the following statement:

There are two questions of law involved in this appeal, as follows:

1. Is there any legal authority to increase the actual selling price of a domestic dye in finding the market value of a competitive imported dye because the imported dye has greater dyeing strength than the domestic dye?

2. If so, is the addition for strength to be based upon the difference between the dyes when used for the purpose for which they are commercially used or the difference as found in a laboratory in the dyeing of articles for which such dyes are not commercially used?

It is admitted that the imported merchandise is subject to the provisions of paragraph 28 of the Tariff Act of 1922, the pertinent part of which reads as follows:

PAR. 28.  *  *  *  45 per centum ad valorem based upon the American selling price (as defined in subdivision (f) of section 402, Title IV) of any similar competitive article manufactured or produced in the United States, and 7 cents per pound: *Provided*, That for a period of two years beginning on the day following the passage of this act the ad valorem rate of duty shall be 60 per centum instead of 45 per centum. If there is no similar competitive article manufactured or produced in the United States, then the ad valorem rate shall be based upon the United States value as defined in subdivision (d) of section 402, Title

IV.    For the purposes of this paragraph any coal-tar product provided for in this act shall be considered similar to or competitive with any imported coal-tar product which accomplishes results substantially equal to those accomplished by the domestic product when used in substantially the same manner: *Provided,* That no duty imposed under this paragraph shall be increased under the provisions of section 315: *Provided,* That the specific duty of 7 cents per pound herein provided for on colors, dyes, or stains, whether soluble or not in water, color acids, color bases, color lakes, leuco-compounds, indoxyl, and indoxyl compounds, shall be based on standards of strength which shall be established by the Secretary of the Treasury, and that upon all importations of such articles which exceed such standards of strength the specific duty of 7 cents per pound shall be computed on the weight which the article would have if it were diluted to the standard strength, but in no case shall any such articles of whatever strength pay a specific duty of less than 7 cents per pound: *Provided further,* That beginning six months after the date of passage of this act it shall be unlawful to import or bring into the United States any such color, dye, stain, color acid, color base, color lake, leuco-compound, indoxyl, or indoxyl compound unless the immediate container and the invoice shall bear a plain, conspicuous, and truly descriptive statement of the identity and percentage, exclusive of diluents, of such color, dye, stain, color acid, color base, color lake, leuco-compound, indoxyl, or indoxyl compound contained therein: *Provided further,* That on and after the passage of this act it shall be unlawful to import or bring into the United States any such color, dye, stain, color acid, color base, color lake, leuco-compound, indoxyl, or indoxyl compound if the immediate container or the invoice bears any statement, design, or device regarding the article or the ingredients or substances contained therein which is false, fraudulent, or misleading in any particular: *Provided further,* That in the enforcement of the foregoing provisos in this paragraph the Secretary of the Treasury shall adopt a standard of strength for each dye or other article which shall conform as nearly as practicable to the commercial strength in ordinary use in the United States prior to July 1, 1914; that if a dye or other article has been introduced into commercial use since said date, then the standard of strength for such dye or other article shall conform as nearly as practicable to the commercial strength in ordinary use; that if a dye or other article was or is ordinarily used in more than one commercial strength, then the lowest commercial strength shall be adopted as the standard of strength for such dye or other article: *Provided further,* That any article or product which is within the terms of paragraph 1, 5, 38, 40, 61, 68, 84, or 1585, as well as within the terms of paragraph 27, 28, or 1549, shall be assessed for duty or exempted from duty, as the case may be, under paragraph 27, 28, or 1549.

Subdivision (f) of section 402, Title IV, of the Tariff Act of 1922 reads as follows:

SEC. 402. (f) The American selling price of any article manufactured or produced in the United States shall be the price, including the cost of all containers and coverings of whatever nature and all other costs, charges, and expenses incident to placing the merchandise in condition packed ready for delivery, at which such article is freely offered for sale to all purchasers in the principal market of the United States, in the ordinary course of trade and in the usual wholesale quantities in such market, or the price that the manufacturer, producer, or owner would have received or was willing to receive for such merchandise when sold in the ordinary course of trade and in the usual wholesale quantities at the time of exportation of the imported article.

It is contended by counsel for appellant that the Board of General Appraisers was without authority to use the American selling price of the domestic competitive dye as a basis from which it might proceed to determine the value of the imported dye; but that, having ascertained the American selling price of the competitive domestic dye, there was nothing more for the board to do except to hold that the price thus ascertained was the dutiable value of the imported dye.

We are not in accord with this view.

Paragraph 28, supra, provides that merchandise coming within its provisions shall be subject to duty at "45 per centum ad valorem based upon the American selling price (as defined in subdivision (f) of section 402, Title IV) of any similar competitive article manufactured or produced in the United States."

The Congress has not said that the imported dye should be subject to duty at 45 per centum ad valorem of the American selling price of a similar competitive article manufactured or produced in the United States, but it has definitely and without ambiguity provided that the dutiable value of the imported dye *shall be based upon* the American selling price of a similar competitive domestic article. One of the members of the importing company recognized the evident purpose of Congress and required the merchandise involved in this case to be entered at a value *based upon* and higher than the American selling price of crystal violet 6 B, a domestic dye which he considered competitive with the imported dye. The fact that the value stated in the entry was less than that found by the board to be the correct value is unimportant in this connection.

According to tests made by both the Government and the importer, the imported dye was a more highly concentrated article than the domestic; and, whether applied to paper or to woolen and cotton yarns, a greater amount of the domestic competitive dye was required in order to accomplish results substantially equal to those accomplished by the imported dye, when applied in substantially the same manner.

The American selling price of the domestic competitive dye was $2.85 per pound, less 1 per centum discount for cash in 10 days. In our opinion, the method of appraisement provided by Congress requires that $2.85, less 1 per centum, should be the basis from which the appraiser should proceed to determine the dutiable value of the imported dye. It having been ascertained that the imported dye was of greater value than the domestic dye, because a greater amount of the domestic dye was required in order to accomplish results substantially equal to those accomplished by the imported dye when applied in substantially the same manner, it was the manifest duty of the appraiser, and, upon appeal, of the single general appraiser and of the Board of General Appraisers, to determine to what extent the value of the imported dye

exceeded the value of the domestic dye.    Such excess in value having been ascertained; it was the duty of such officials to add such sum to the American selling price of the domestic dye to determine the dutiable value of the merchandise.    We think this method of procedure is in accord with the legislative intent as expressed in paragraph 28, supra.

We have been unable to find any substantial evidence in this case that it was or was not the commercial practice to sell dyes at prices in exact proportion to tinctorial strength.    In the absence of evidence of commercial practice to the contrary, we think it was proper, upon the record in this case, to add, in direct proportion to tinctorial strength, to the American selling price of the competitive domestic dye such sum as would equalize the obvious difference in value of the competitive dyes.

The second question of law propounded by counsel for appellant involves an interpretation of the language used by Congress in its definition of similar competitive coal-tar products, contained in paragraph 28, supra.    The provision is as follows:

* * * For the purposes of this paragraph any coal-tar product provided for in this act shall be considered similar to or competitive with any imported coal-tar product which accomplishes results substantially equal to those accomplished by the domestic product when used in substantially the same manner: * * *

Keeping in mind the stated purpose of Congress in enacting the Tariff Act of 1922, which was "To provide revenue, to regulate commerce with foreign countries, to encourage the industries of the United States, and for other purposes," the task before us is not one of difficult proportions.    It seems to us that Congress has provided that any domestic dye shall, for the purposes of this paragraph, be considered similar to or competitive with any imported dye. if, when applied in substantially the same manner to articles or materials for which both dyes are commercially suitable, the imported dye accomplishes results substantially equal to those accomplished by the domestic dye.

To hold that Congress intended that, in order to determine whether such dyes were similar or competitive, they should be applied to articles or materials for which such dyes are chiefly used in the commerce of the United States, would defeat the evident purpose of Congress.    It seems incredible that Congress, with the intention of encouraging the development of the dye industry in the United States, should require that such industry should be developed and its products actually sold in the markets of the United States in competition with imported dyes, before adequate protection would be afforded.    A mere statement of the proposition is sufficient to show its absurdity.

Mr. William Paul Pickhardt, an officer of the appellant company, testified in the court below in part as follows:

Q. Mr. Pickhardt, are you familiar with the crystal violet extra of the kind included in your shipment from the Badische Anilin & Soda Fabrik, per steamship *Noordam*, covered by reappraisement 13174–A?—A. I am.

Q. Do you know the purpose for which such crystal violet extra is chiefly used in the United States?—A. I do.

Q. For what purpose is the crystal violet chiefly used?

\*        \*        \*        \*        \*        \*        \*

A. The largest present use is in the tinting of paper. It is also used in the manufacture of typewriter ribbon, and in the manufacture of stamp pads. It has been used in the manufacture of lakes. It is used in the dyeing of silk; it is used in a small way in the dyeing of buttons, in a small way in the dyeing of leather, and probably it has a few other unimportant uses.

Q. To what extent, if any, is it used in the dyeing of woolen yarns?

\*        \*        \*        \*        \*        \*        \*

A. I have never heard of its use in recent times for the dyeing of woolen yarns, since much better products have come on the market.

Q. To what extent is it used in the dyeing of cotton yarns?—A. Only to a very imited extent, because there also are more suitable products.

Q. For how long a period of time has that been the case?—A. That has been the case during my experience in the business.

Q. You mean that during your experience it has not been so?—A. Since 1901.

On cross-examination the witness testified in part as follows:

Q. Mr. Pickhardt, you testified that this was not suitable for dyeing wool, did you not?—A. I did not.

Q. Is it suitable for dyeing wool?—A. Yes.

Q. Then you don't mean to have your testimony given in response to Mr. Halstead, as being construed that it is not suitable for dyeing wool?—A. No.

Q. There is no question in your mind about but what it is suitable for that use?—A. Certainly.

Q. You are talking now about the crystal violet 6 B, and crystal violet extra, both dyes?—A. That is right, yes.

It appears from the undisputed testimony that both the imported dye and the domestic competitive dye are suitable for use in dyeing wool.

The witness was competent to testify concerning the commercial suitability for use of the respective dyes. His testimony, given on cross-examination, is unqualified as to the suitability of the respective dyes for dyeing wool. He must have intended to be understood as saying that such dyes were actually, practically, and commercially fit for such use. If he did not so intend, he should, and no doubt would, have qualified his testimony.

The importer presented to the trial court in detail the results of tests made on certain paper in order to show the relative tinctorial strengths of the competitive dyes. The burden of proof was upon him to show that each of such dyes was commercially suitable for use on such material. He offered no testimony, except upon cross-examination, as to the use to which the domestic dye was commercially suitable. He was content with an explanation as to the relative

tinctorial strengths of the competitive dyes, when applied to a material for which the imported dye was *chiefly* used. It should be noted that Congress has provided that the domestic dye shall be considered similar to or competitive with the imported dye, if the *imported dye accomplishes results* substantially equal to those accomplished by the *domestic* dye when applied in substantially the same manner. The imported dye is to be compared with the domestic dye, and such comparison may be made without regard to the chief use of either dye.

In determining what material competitive dyes should be applied to in order to ascertain their relative tinctorial strengths it should first be ascertained to what materials the domestic dye may actually, practically, and commercially be applied. Such material or materials having been ascertained, and it having been determined that the imported dye also is actually, practically, and commercially suitable for dyeing one or more of such materials, it is proper for the appraiser to determine the relative tinctorial strengths of such dyes by proper tests upon any of them.

If the imported dye is not actually, practically, and commercially suitable for use on any of the materials to which the domestic dye may be actually, practically, and commercially applied, the dyes are not competitive within the meaning of paragraph 28, supra; and it is obvious that tests to determine the relative tinctorial strengths of such dyes, if made upon any of such materials, would be of no value. Nor should such tests be made upon material for the dyeing of which either or both of such dyes would have but an incidental, rare, or exceptional use. *Kahlen* v. *United States,* 2 Ct. Cust. Appls. 206 T. D. 31947.

The Board of General Appraisers accepted the testimony of the witnesses for the Government in preference to that given by the witnesses for the importer as to the relative tinctorial strengths of the competitive dyes. Such accepted testimony was based upon proper tests, viz, the application of such dyes in substantially the same manner to articles or materials for which such dyes were commercially suitable. Its findings of fact, therefore, being fully supported by the evidence, are final and conclusive.

The board found that the American selling price of the domestic competitive article was $2.82, and that the reappraised value should have been 25 per centum more, which is $3.52. However, through an error—clerical, typographical, or other—this value was stated in the board's decision to be $3.62.

The board should have held that the reappraised value of the imported merchandise was $3.52 per pound, and its judgment is modified accordingly.

*Modified.*

BARBER, Judge, dissents.

I regret very much that I can not concur in the opinion of my esteemed associate, Judge Hatfield.

The opinion, as I read it, establishes the principle that if the Government so elects, the dutiable status of an imported dye may be determined by its minor and not its chief use, and that whether the imported dye accomplishes results substantially equal to those accomplished by the domestic product may be determined at the election of the Government by applying the imported and domestic dye to materials for which neither of them is chiefly used.