KUTTROFF-PICKHARDT & Co. (INC.) *v.* UNITED STATES (No. 2700)[1]

1. RE-REAPPRAISEMENT, PARAGRAPH M, TARIFF ACT OF 1913—APPLICATION
      FOR REVIEW OF REAPPRAISEMENT, SECTION 501, TARIFF ACT OF 1922—
      FORM OF APPEAL.
      Paragraph M, tariff act of 1913, provided for an "appeal for re-reappraisement" to the board from the decision of the general appraiser.   Section 501, Tariff Act of 1922, provides for "an application for  *  *  *  review" by the board of the decision of the general appraiser.   An application under section 501, using the form provided for paragraph M, and hence making a specific application for "re-reappraisement" instead of review of reappraisement,

[1] T. D. 42032.

although it could and should be improved upon, is sufficient to vest jurisdiction in the board under section 501. Especially is this true in view of the fact that section 489, Tariff Act of 1922, speaks of the review of reappraisement under section 501 as a "re-reappraisement."

2. UNITED STATES VALUE—AMERICAN SELLING PRICE—APPRAISEMENT OF COAL-TAR DYE—COMPETITIVENESS.

Whether or not merchandise is freely offered for sale to all purchasers (sec. 402 (d) and (f), Tariff Act of 1922) must depend upon the number of purchasers and the demand. It should at least appear that some reasonable quantity of the offered article was ready, or could be produced, for reasonably prompt delivery. The existence of the article should be advertised, mentioned, made known, or called to the attention of potential customers. To establish "the price that the [American] manufacturer, producer, or owner would have received or was willing to receive" ((f)), it must at least appear that he had something to sell at that price. Where the evidence showed that nothing less than 100 pounds of an American dye known as pontamine fast pink G, claimed to be competitive with an imported dye known as benzo red, could be regarded as the usual wholesale quantity, three sales of 50, 50, and 10 pounds, respectively, with no showing that anyone had ever had a chance to buy as much as 100 pounds, can not be regarded as supporting the appraisement based on the American selling price. It should have been made at the United States value, section 402 (d).

United States Court of Customs Appeals, February 24, 1927

APPEAL from Board of United States General Appraisers, Circ. Reap. 36004

[Reversed.]

*Barnes, McKenna & Halstead* (*Albert McC. Barnes, jr.*, of counsel) for appellant.
*Charles D. Lawrence*, Assistant Attorney General (*Oscar Igstaedter*, special attorney, of counsel), for the United States.
*Lamb & Lerch* (*John G. Lerch* of counsel) *amici curiæ.*

[Oral argument January 24, 1927, by Mr. Barnes, Mr. Igstaedter, and Mr. Lerch]

Before GRAHAM, Presiding Judge, and SMITH, BARBER, BLAND, and HATFIELD, Associated Judges

BLAND, Judge, delivered the opinion of the court:

This case has been before this court on two prior occasions under suits numbered 2365, 12 Ct. Cust. Appls. 316, and 2494, 13 Ct. Cust. Appls. 17, with the result that in each instance the cause was reversed and remanded to the Board of United States General Appraisers (now United States Customs Court) to enable it to make its findings of facts and conclusions of law. The issue before us concerns the appraisement, reappraisement, and so-called re-reappraisement of a certain imported coal-tar color known as benzo red 12 B, which was entered at a value of $0.795 per pound and advanced by the local appraiser to $2 per pound, based upon American selling price of a domestic product.

Upon appeal by the Government the single general appraiser affirmed the appraised value. The single general appraiser in apprais-

ing the imported merchandise used as a basis of comparison a coal-tar color manufactured and sold in the United States by E. I. du Pont de Nemours Co., known as pontamine fast pink G. The importer and the Government both appealed from the decision of the single general appraiser to the Board of United States General Appraisers.

The Board of United States General Appraisers agreed with the single general appraiser as to the correctness of the basis of his appraisement, but modified his appraised value and found the value to be $7 per pound, since it was shown that the tinctorial powers or dyeing strength of the benzo red 12 B was three and one-half times that of the pontamine fast pink G.

The first question raised by appellant is that the appeal to re-reappraisement by the Government did not confer jurisdiction on the board of three general appraisers, for the reason that the document filed does not purport to be a petition or application for review, but is an appeal for re-reappraisement upon the form or blank used under the tariff act of 1913, which act provided for appeals to re-reappraisement.

The appeal of the Government is as follows:

To the BOARD OF U. S. GENERAL APPRAISERS, *New York, N. Y.*

GENTLEMEN: I hereby appeal from the reappraisement by the United States General Appraisers to a re-reappraisement by a Board of United States General Appraisers, in accordance with the provisions of Section 501, Tariff Act of 1922, upon certain Benzo Red imported by Kuttroff, Pickhardt & Co., Inc., in the S. S. *Noordam*, entered Jan. 4, 1923. Entry No. 807994. Reap. No. 13619–A.

Recd. Jul. 11, 1923, B'd. Gen'l. Apprs.

    Respectfully,                          PHILIP ELTING, *Collector.*
    Requested by:
      Asst. Atty. Genl. S.

The appeal of the importers is as follows:

Invoice No. —.
Entry No. 807994.

                              PORT OF NEW YORK, *July 14, 1923.*

  SIR:

As we consider the reappraisement made by Hon. Geo. Stewart Brown, United States General Appraiser, too high on certain coal tar products (Benzo Red), imported by us in the *Noordam* from Germany, we have to request that the same may be re-reappraised by the Board of General Appraisers pursuant to law, with as little delay as your convenience will permit.

(Rec'd Jul. 16, 1923.   B'd Gen'l Apprs.)

      Respectfully,

                    KUTTROFF, PICKHARDT & Co., Inc.,
                    (Importer's address:) *128 Duane Street, N. Y. C.*
                    By BARNES, CHILVERS & HALSTEAD,
                                        *2 Rector Street, N. Y. C.*

  To Hon. PHILIP ELTING, *Collector of Customs.*

The pertinent language of paragraph M of the tariff act of 1913 reads as follows:

\* \* \* The decision of the general appraiser in cases of reappraisement shall be final and conclusive as to the dutiable value of such merchandise against all parties interested therein, unless the importer, owner, consignee, or agent of the merchandise shall deem the reappraisement of the merchandise too high, and shall, within five days thereafter, *give notice to the collector, in writing, of an appeal,* or unless the collector shall deem the reappraisement of the merchandise too low, and shall within ten days thereafter *appeal for re-reappraisement;* \* \* \* (Italics ours.)

Section 501 of the Tariff Act of 1922 in part is as follows:

The decision of the general appraiser, after argument on the part of the interested parties if requested by them or by either of them, shall be final and conclusive upon all parties unless within ten days from the date of the filing of the decision with the collector *an application for its review* shall be filed with or mailed to said board by the collector or other person authorized by the Secretary of the Treasury, and a copy of such application mailed to the consignee, or his agent or attorney, or filed by the consignee, or his agent or attorney, with the collector, by whom the same shall be forthwith forwarded to the Board of General Appraisers. Every such application shall be assigned by the Board of General Appraisers to a board of three general appraisers, who shall consider the case upon the samples of the merchandise, if there be any, and the record made before the general appraiser, and, after argument on the part of the parties if requested by them or either of them, shall affirm, reverse, or modify the decision of the general appraiser or remand the case to the general appraiser for further proceedings, and shall state its action in a written decision, to be forwarded to the collector, setting forth the facts upon which the finding is based and the reasons therefor. The decision of the Board of General Appraisers shall be final and conclusive upon all parties unless an appeal shall be taken by either party to the Court of Customs Appeals upon a question or questions of law only within the time and in the manner provided by section 198 of an act entitled "An act to codify, revise, and amend the laws relating to the judiciary," approved March 3, 1911. (Italics ours.)

In *Johnson Co.* v. *United States,* 13 Ct. Cust. Appls. 373, the meaning and effect of certain parts of section 501, *supra,* were passed upon by this court, and there some of the differences between section 501 and its predecessor, paragraph M of the tariff act of 1913, were discussed. The court said:

The section provides that the party so desiring may file an "application for review." We are aware of no precise definition ever given by the courts of the United States for the word "review." In the absence of such a definition the ordinary meaning would obtain. Webster (New International) Dictionary thus defines the term:

2. Law, specif., judicial re-examination, as of the proceedings of a lower court by a higher.

And this, we believe, is the meaning practically always applied to the term where it is used in the laws of the United States. To illustrate, section 237 of the Judicial Code, as amended by the act of February 13, 1925, provides for the review by the Supreme Court, in certain cases, of the final judgments or decrees of the State courts of last resort. To a like effect is section 238 of the above-cited

act, and many other similar statutes not necessary to cite here. We think, without exception, the term as applied in Federal statutes and practically all State courts must be understood in this light. In *Weehawken Wharf Co.* v. *Knickerbocker C. Co.*, 25 Misc. 309, the court said:

> The words "to review" must be taken to mean to review on appeal, for that is the only method we know of where a review may be had. * * * The words "to review" mean simply that the court, on appeal, may be asked to consider the question presented below as the ground for the determination in the order.

Section 489 of the Tariff Act of 1922 is in part as follows:

> * * * Duties shall not, however, be assessed upon an amount less than the entered value, except in a case where the importer certifies at the time of entry that the entered value is higher than the value as defined in this act, and that the goods are so entered in order to meet advances by the appraiser in similar cases then pending on appeal for reappraisement or re-reappraisement, and the importer's contention in said pending cases shall subsequently be sustained, wholly or in part, by a final decision on reappraisement or re-reappraisement, and it shall appear that the action of the importer on entry was so taken in good faith, after due diligence and inquiry on his part, and the collector shall liquidate the entry in accordance with the final appraisement.

In the *Johnson* case, *supra*, this court held, in substance, that the proceedings under section 501 before the single general appraiser were hearings *de novo*, while the proceedings under review, by the Board of General Appraisers, under the same section, were appellate and subject to the usual restrictions for appellate procedure, except where modified by the statute.

In section 489 of the Tariff Act of 1922 Congress speaks of the action of the board under discussion as being a "re-reappraisement." The courts define "to review" to mean "to review on appeal." The Government in the case at bar has *appealed* to a re-reappraisement. Although the form of the petition for review on appeal to re-reappraisement could and should be improved upon, we conclude that it is sufficient in this case to vest jurisdiction in the Board of United States General Appraisers for the performance of its duties required by section 501.

The finding of the facts and conclusions of law by the Board of United States General Appraisers, now before this court, are as follows:

> In this application for review, the decision of the board having been reversed and the case remanded for further proceedings, the board has again heard argument and considered the case on the record made before the single general appraiser.

> As a matter of fact the board finds that the importation consists of coal-tar colors, known as benzo red 12 B, entered at a value of $0.795 per pound and advanced by the local appraiser to $2 per pound, based on the American selling price. The single general appraiser affirmed the appraised value. The basis of comparison used in the appraisal and reappraisal was comparison of the importation with a coal-tar color manufactured and sold in the United States by E. I. du

Pont de Nemours Co., known as pontamine fast pink G, sold in the United States at $2 per pound. We find that the two articles compared possess the same quality of shade, fastness to light, washing, bleaching, salt water, acid, soda, and chlorine; that the two articles compared accomplished results substantially equal when used in substantially the same manner, but that the imported merchandise possessed three and one-half times as much strength for the purposes and uses intended and applied to the two dyes as the domestic product; that the two articles compared are both sold in the trade in the United States and used in practice according to the respective tinctorial powers.

We expressly find that the manufacturer of the domestic article referred to would have received and was willing to receive for such merchandise, when sold in the ordinary course of trade and in the usual wholesale quantities at the time of exportation of the imported article, the price of $2 per pound. We further find that the manufacturer did actually sell the domestic article at $2 per pound, including the cost of all containers and coverings of whatever nature, and all other costs, charges, and expenses incident to placing the merchandise in condition packed ready for delivery, and such article was freely offered for sale to all purchasers in the principal market in the United States in the ordinary course of trade and in the usual wholesale quantities in such market at such time of exportation.

Therefore, we conclude as a matter of law that benzo red, the merchandise under consideration, is competitive with pontamine fast pink G, sold to the trade and used in the United States, and that therefore the appraisal was properly based upon the selling price of the domestic color, known as pontamine fast pink G, but that in both sale and use there is and must be a proportionate consideration and differentiation as to the different tinctorial powers or dyeing strength of the two commodities, and that therefore the single general appraiser should have reappraised the imported merchandise per pound three and one-half times the sale price in the United States of pontamine fast pink G, to wit, $7 per pound, and the decision of the single general appraiser is modified accordingly.

The sole remaining question presented to us for decision is, Does the evidence support the findings of the board? The importer's assignment of errors and its argument, both orally and in briefs, challenge the sufficiency of the evidence to support the findings in the following particulars:

(1) The domestic color, pontamine fast pink G, is not shown to have been freely offered for sale to all purchasers.

(2) There is no proof that the domestic merchandise was offered for sale in the principal market.

(3) There is no proof of what the usual wholesale quantities of the dye in question was, or whether sales, or offers of sales, or willingness to sell were predicated thereon.

(4) The necessary facts upon which a finding could be made that the purchaser could have received or was willing to pay $2 per pound for pontamine fast pink G do not appear in the record.

(5) Pontamine fast pink G was never offered for sale in the ordinary course of trade.

(6) No proof in the record that benzo red, the imported color, and pontamine fast pink G, the domestic color, were commercially suitable for the same purpose.

In order to properly pass upon appellant's first five objections to the sufficiency of the record to support the findings of the trial court, this court has carefully examined the long and voluminous record of

testimony of a number of witnesses, and finds the following to be the only testimony bearing upon these questions.

Willard F. Van Riper, a witness for the Government, testified that he was assistant sales manager for E. I. du Pont de Nemours & Co., the manufacturer and seller of pontamine fast pink G, and that he was familiar with the sales and prices at which the sales are made, by that company, of dye in wholesale quantities. In answer to the question, "Will you state, Mr. Van Riper, at what price you sold pontamine fast pink G in wholesale quantities to the trade in the United States on or about December 8, 1922?", the witness replied: "Two dollars a pound, less the usual cash discount, 1 per cent for 10 days." On cross-examination he was asked: "On what date did you sell any of said dye at $2 per pound?" The witness [examining photostat copy of a bill] replied: "There was a shipment made from our Providence warehouse on December 9, 1922, to the I. E. Farmer Co., of Middletown, Conn."

He further testified this sale was for 50 pounds; that he could not say that it was the first sale; that he presumed that was the entire amount of the order; that he did not know; that he did not make the sale himself; that he did not know the date upon which the sale was made; that this amount (50 pounds), shipped on December 9, 1922, was in fulfillment of an order undoubtedly received prior to that date; that they did not ship without an order; that the shipment was made from the Providence warehouse; that he was located in Wilmington, Del.; that he did not see the shipment made; that his home office always receives a copy which is marked in the upper left-hand corner of all invoices on shipments; that he received the copy from their files; that they did not issue printed price lists for their goods, but that they did issue catalogues giving the dyeing qualities and small samples of dyed materials showing the dyeing; that when his company has a new dye they announce it to their branch managers, who in turn write or visit, through their salesmen, the different customers, announcing the new dyestuffs, and at practically the same time they ship to the branch offices printed announcements for distribution; that he had no printed announcements covering pontamine fast pink G with him; that he had one at Wilmington, Del., which he would produce on the following day.

Later, witness produced a bulletin of pontamine fast pink G and stated that several copies of it were sent from their Wilmington office to the various branch offices and that they in turn sent them to customers from whom they would accept orders; that he could not say as to whether they were sent generally to wholesale dealers in dyes throughout the United States or not; that he did not know whether they were sent to Kuttroff, Pickhardt & Co.; that he did not know the date of sending the announcement from the branch

offices to the consumers of dyes, but probably subsequent to September 14, the date of the announcement. The witness further stated that pontamine fast pink G was announced to the trade in this country on September 14, 1922; that the Du Pont Co. "have but one strength of pontamine fast pink G and one price, $2 *per pound in barrel lots, slightly additional charges for smaller shipments, to take care of the additional costs per pound of containers, $2 per pound is the barrel lot wholesale order price;*" that a keg is from 100 pounds up, $2 per pound, becomes effective from $2 per pound up; that pontamine fast pink G is one of the products they hope to sell large quantities of and that the reason they have not sold large quantities so far is due to its newness on the market; that the shipment to I. E. Farmer & Co., at Middletown, Conn., was for 50 pounds of pontamine fast pink G at $2.03 per pound, or a total of $101.50; that the order was numbered W 11700; that the last shipment immediately prior to December 8, 1922, was November 29, 1922—10 pounds of pontamine fast pink G selling at $2.10 per pound; that the 10 cents is for the small quantity.

The witness referred also to a sale having been made on November 6, 1922, of 50 pounds on an order made some time between September and November.

In answer to the question as to what quantity of this dye he had on hand on or about December 8, 1922, the witness Van Riper answered: "Sufficient to take care of all orders and then some.  *  *  *  Our practice is to keep reasonable stock of all of our dyestuff, to take care of orders as they come along." In answer to the question, "What quantity of dye of pontamine fast pink G did you have in stock ready for sale and immediate delivery on December 8, 1922?" the witness replied: "I don't know the exact amount. I know it was a reasonable amount—an amount we felt necessary to have on hand to take care of orders." Question: "What quantities of such dyes did you have on hand and ready for delivery on September 22, 1922?" Answer: "You will remember that the dye was announced September 14; even before the announcement we had to have sufficient stocks to make deliveries, so that on September 22, if we made sales, we would have slightly less." Witness stated that he could not say that there were any sales made prior to September 22.

Subdivision (f) of section 402, Title IV, of the Tariff Act of 1922 defines the American selling price as follows:

(f) The American selling price of any article manufactured or produced in the United States shall be the price, including the cost of all containers and coverings of whatever nature and all other costs, charges, and expenses incident to placing the merchandise in condition packed ready for delivery, at which such article is freely offered for sale to all purchasers in the principal market of the United States in the ordinary course of trade and in the usual wholesale quantities in such

market, or the price that the manufacturer, producer, or owner would have received or was willing to receive for such merchandise when sold in the ordinary course of trade and in the usual wholesale quantities at the time of exportation of the imported article.

It will be noted that from the provisions of the above subsection the American selling price of the pontamine fast pink G is the price (1) "at which such article is freely offered for sale to all purchasers in the principal market in the United States, in the ordinary course of trade and in the usual wholesale quantities in such market," or (2) "the price that the manufacturer, producer, or owner would have received or was willing to receive for such merchandise when sold in the ordinary course of trade and in the usual wholesale quantities at the time of exportation of the imported article."

Before the single general appraiser the importer evidently undertook to make a *prima facie* case, that there was no article manufactured or produced in the United States similar to and competitive with benzo red, and contended that the United States value of the imported article, rather than the American selling price of the domestic product, should have been taken in the appraisal of the merchandise. That importer made such *prima facie* case seems to be conceded, since the Government then assumed the burden of showing the competitiveness and similarity of pontamine fast pink G. We are therefore not concerned here with the weight of the testimony of the importer as being sufficient to make the *prima facie* case, but we are confronted with the proposition as to whether the testimony as a whole sustains the findings of the board in the particulars above indicated. Our task is simplified by the ruling of this court in the case of *Kuttroff, Pickhardt & Co.* v. *United States*, 14 Ct. Cust. Appls. 176, T. D. 41698. We quote from that decision:

We do not think the record contains any competent, substantial evidence from which it can be found that sulfanthrene pink F F paste was freely offered for sale to all purchasers in the ordinary course of trade and in the usual wholesale quantities on or before May 4, 1923.

The testimony which we have recited furnishes about all, and the best, argument that is necessary upon that question.

Whether or not merchandise is freely offered for sale to all purchasers must depend upon the demand therefor and the number of purchasers thereof. Sulfanthrene pink, apparently, was produced to compete with imported hydron pink, for which there was a large demand, by numerous purchasers, in wholesale quantities, such quantities largely exceeding the entire production of sulfanthrene pink prior to the date of exportation of the hydron pink in this case. How can it be thought that only 223 pounds, produced between January and April or May, could furnish any real competition with the imported article? Congress evidently meant to encourage the production of new dyes in this country, but can it be that it intended that the appraisal of an article imported in large quantities, and for which there was a great demand, should be upon the basis of the selling price of two sales only of a competitive article, the supply of which was exhausted before the importation was made?

To freely offer an article for sale within the contemplation of subdivision (f), it should, at least, appear that some reasonable quantity of the offered article was ready or could be produced for reasonably prompt delivery. The existence of the article should be so advertised, mentioned, made known, or called to the attention of potential customers that they might or could learn that it was possible to procure the same. *Sandoz Chemical Works* v. *United States*, 13 Ct. Cust. Appls. 466, T. D. 41365; *Kuttroff, Pickhardt & Co.* v. *United States*, 12 Ct. Cust. Appls. 299. It would be natural to expect also that customs authorities would be informed of its existence.

We can not think that two sales of the sulfanthrene pink, in a place remote from the chief users of that article, even if it be assumed, which we do not, that such sales were in the usual wholesale quantities in the ordinary course of trade, satisfy the requirements of subdivision (f).

The assembling of the sales agents of the Du Pont Co., as shown by the testimony, the information given them that the domestic article was available with the direction that they should go forth and offer it for sale, in view both of what was done and what was *not* done as a result thereof, is equally unconvincing. It tends to show that there was no real intent on the part of the Du Pont Co. and that it did not possess the ability to offer the new dye for sale to all purchasers before May 4, 1923.

We do not consider whether any alternative finding could, on the evidence, be made that the price at which sulfanthrene pink was sold in this case was the price the producer would have received or was willing to receive therefor when sold in the ordinary course of trade, in the usual wholesale quantities, which in *Kuttroff, Pickhardt & Co.*. v. *United States*, 13 Ct. Cust. Appls. 17, T. D. 40861, was held might, if made, justify the application of subdivision (f), because there is no proof thereof here except the two sales mentioned and the fact that the price at which the sales were made was the price fixed for the sulfranthrene pink by the Du Pont Co.

To establish the price which the producer would have received or was willing to receive it must at least appear that he had something to sell at that price, and also that he had or could produce enough to sell, so that more than two small orders could be filled without exhausting the supply, in a case where the demand was as great as in this case. If this is not so, the mere declaration of a possible producer that he was willing to sell at a named price would enable him to compel an appraisal at a value which did not then exist and might never obtain. In other words, without having anything to sell, without knowing what it would cost to produce the article, he could by mere *fiat* control, to some extent at least, the course of commerce.

We are satisfied that there is in the record no competent substantial evidence to support a finding that sulfanthrene pink F F paste was freely offered for sale to all purchasers at the time the merchandise here was exported, which, under the rule of the *Sandoz Chemical Works* case, *supra*, is indispensable in this case to the application of subdivision (f).

As we view it, the principles announced in the above decision support appellant's first five contentions in the case at bar. The evidence in this case does not disclose the principal market of the domestic merchandise, unless it can be said that one sale of 50 pounds at what is obviously less than a wholesale quantity, at Middletown, Conn., was an offer within the meaning of the statute, and this we do not concede. The only other proof of sales was of 50 pounds and 10 pounds. The particulars of these sales were not given. It

was not shown to whom these two sales were made, nor is there anything in the evidence from which we can infer that they were made in the ordinary course of trade.

While the record is unsatisfactory as to what was the usual wholesale quantity for an offer of sale of the domestic merchandise, we think the fairest interpretation of the meager evidence would be that nothing less than 100 pounds would be regarded as the usual wholesale quantity. No sale was made of this amount. No purchaser was ever shown to have been offered or to have had the opportunity of purchasing the domestic merchandise in wholesale quantities in the usual course of trade.

We are not unmindful of the breadth and scope of the language used by Congress in defining the American selling price. Presumably Congress, in using the language, "or the price that the manufacturer, producer, or owner would have received or was willing to receive," contemplated an American producer of a coal-tar product who had something to sell and deliver but who, for some reason, had not done so or possibly could not do so.

Just how the appraising officials are to determine how much the American producer "would have received" or how much he was "willing to receive" is not suggested in the statute. It is presumed that he would have received and was willing to receive the price at which he freely offered it for sale, etc., but Congress must have had in mind a price other than that which is created by an offer to sell, since it mentioned two prices.

The most favorable view that can be taken of the Government's testimony as to the American producer's *offer* or as to his *willingness* is to find that the domestic producer forwarded to his branch office, for distribution to the trade, certain catalogues or trade announcements which contained their offer with reference to pontamine fast pink G.

We do not think this is either an *offer*, or an expression or indication of *willingness* within the meaning of the paragraph. A producer who is willing to sell a commodity at a given price ordinarily seeks those who are in a position to buy. He may not reach all of them, but he certainly ought to reach some of them with his expression of willingness. This record, outside of the three sales referred to, shows no instance of a producer who was willing to sell making such willingness known to a prospective buyer, much less does it show that the offer was made freely to all purchasers in the principal markets in the ordinary course of trade and in the usual wholesale quantities at the time of exportation of the imported article.

In *Sandoz Chemical Works* v. *United States*, 13 Ct. Cust. 466, this court found that the Pharma Chemical Corporation offered its product for sale in one of the principal markets throughout the

United States when it listed and offered it to the general buying public through a proper governmental agency (the Dye and Chemical Section in the Treasury Department).

We are not called upon to say what under all circumstances would be a proper offer or indication of willingness, but we do hold that the facts as disclosed in the instant record do not meet with our notion of what the proof should show, and that, therefore, the record does not contain sufficient facts to support the findings of facts of the Board of United States General Appraisers as to the first five points raised by the appellant.

The sixth point raised by the importer is that there was no proof in the record that the benzo red and pontamine fast pink G were commercially suitable for the same purpose. Neither side indulged in extended argument or citation on this proposition, probably feeling that this issue was determined adversely to the contentions of the importer in *Kuttroff, Pickhardt & Co.* v. *United States*, 13 Ct. Cust. Appls. 203. It is not necessary for us to decide this question here, since the judgment of the board must be reversed on account of our conclusions heretofore expressed.

Having found that there was not sufficient evidence to sustain the board's findings of facts and conclusions of law based thereon, it follows that its judgment modifying the decision of the single general appraiser must be reversed. Since the reappraisement of the single general appraiser was based upon the American selling price of pontamine fast pink G upon insufficient testimony, his finding can not be approved. In the absence of the American selling price, paragraph 28 of the Tariff Act of 1922 provides: "If there is no similar competitive article manufactured or produced in the United States, then the ad valorem rate shall be based upon the United States value, as defined in subdivision (d) of section 402, Title IV."

The United States value of the merchandise should have been determined by the single general appraiser and accepted as the correct dutiable value. The judgment of the Board of United States General Appraisers (now United States Customs Court) is *reversed.*