MUTUAL SUPPLY CO. ET AL. *v.* UNITED STATES

**No. 5815.**—Invoices dated Yokohama, Japan, February 7, 1940, etc.
Entered at San Francisco, Calif., March 4, 1940, etc.
Entry No. 6693, etc.

(Decided February 11, 1943)

*Lawrence & Tuttle* (*George R. Tuttle* of counsel) for the plaintiffs.
*Paul P. Rao,* Assistant Attorney General (*Richard F. Weeks, Richard II. Welsh,* and *Samuel D. Spector,* special attorneys), for the defendant.
*Joseph F. Lockett,* amicus curiae.

TILSON, Judge: The appeals listed in schedules A and B, hereto attached and made a part hereof, raise for consideration and determination the proper dutiable value of certain "baby" and "white" clams imported from Japan, which were entered at the port of San Francisco at various dates between December 10, 1934, and March 4, 1940. In each of the appeals the plaintiff filed duress entries under the provisions of section 503 (b) of the act of 1930. The merchandise was appraised on the basis of the American selling price, by virtue of a Presidential proclamation dated May 1, 1934, based upon the provisions of sections 336 and 402 (g) of the act of 1930.

These cases were extensively tried and because of the length of the record I shall not attempt any detailed statement of the testimony before me. I have, however, carefully examined and considered the entire record, including the samples and exhibits which constitute a part thereof.

The testimony offered by counsel for the plaintiffs establishes that as to the thirteen appeals listed in schedule B the provisions of section 499 of the act of 1930, with respect to designation by the collector and examination by the appraiser of the merchandise, were not complied with, and since the appraisement of the merchandise as to said thirteen appeals was completed prior to the effective date of the administrative act of 1938, these thirteen appeals are not subject to the provisions of the latter act, but are governed by the provisions of section 499, as originally passed by the Congress.

Therefore, under the authority of *United States* v. *Davis*, 20 C. C. P. A. 305, and *United States* v. *Tower*, 24 C. C. P. A. 456, and the cases therein cited, I hold the appraisement in each of the said thirteen appeals listed in said schedule B to be null and void *ab initio*, and said appeals are accordingly dismissed.

In the case of *North American Mercantile Co.* v. *United States*, Reap. Dec. 5680, Judge Dallinger, in dealing with a very similar situation used the following language, which is quite appropriate here:

Counsel for both the plaintiff and the Government, in their briefs filed herein, contend, however, in spite of the fact that the appraisements herein were null and void *ab initio* the court must nevertheless proceed to find values for the merchandise at bar, to wit, either values based on the American selling price, as contended for by the Government, or export values which, by stipulation, are the invoiced values herein, as contended for by the plaintiff.

*       *       *       *       *       *       *

Nevertheless, counsel for the Government in his brief filed herein contends that the plaintiff has failed to overcome the presumption of correctness attaching to the appraised value. It is manifest, however, that no presumption of correctness exists in the instant case, for the good and sufficient reason that a void appraisement has no presumption. As was aptly said by Brown, Judge, in *Mitsubishi Shoji Kaisha, Ltd.* v. *United States*, Reap. Dec. 4570, 2 Cust. Ct. 935, "No statutory presumption then attaches to it. It is the same as if it were not there. Presumptions from nothing do not presume very far. We do not live with Alice in Wonderland."

Counsel for the Government in his brief filed herein also argues at length that because the President, in his proclamation published in T. D. 47031, *supra*, has decreed that the American selling price is the basis for determining the value of Japanese minced clams, therefore this court willy nilly must find an American selling price for the merchandise herein.

It is to be noted, however, that the President, in and by the provisions of the statute under which he acted, is restricted to declaring an American selling price as the proper basis for determining the value of the imported canned minced clams herein like or similar to domestic canned minced clams. I am precluded, however, from determining whether the domestic minced clams chosen by the appraiser for determining the value of the imported clams are like or similar to the Japanese minced clams imported herein or any other factors relating to value. Inasmuch as the collector and appraiser failed to comply with the mandatory provisions of section 499 of the Tariff Act of 1930, the appraisements herein are null and void *ab initio*, and I so hold. *       *       *       .

The contention by the Government that there was a special regulation issued by the Secretary of the Treasury authorizing the examination of less than the statutory number of packages in this case is completely exploded by the facts in this record.

The seven appeals listed in schedule A were appraised after the effective date of the administrative act of 1938, and are, therefore, subject to its provisions, since the plaintiffs make no contention or showing that they have been injured by reason of the fact that less than the statutory number of packages were examined. The clams covered by these seven appeals were packed in cans weighing 5, 8, and 16 ounces, respectively.

As to the clams in cans weighing 5 and 8 ounces each there is evidence before me that such, like, or similar clams were canned and sold in the United States, at or about the dates of exportation of the involved clams, and there is also evidence as to the price at which such clams were freely offered for sale to all purchasers in the principal markets of the United States, in the ordinary course of trade and in the usual wholesale quantities. However, as to the clams in cans weighing 16 ounces each, the record shows that no such, like, or similar clam was canned and sold in the United States. Two witnesses attempted to testify as to the price they would have received or were willing to receive for clams such, like, or similar to the imported clams when packed in 16-ounce cans.

The record, however, shows that neither of these witnesses had in his possession during the dates here involved any clam of any kind packed in 16-ounce cans. In view of this fact their testimony as to what they would have received or were willing to receive for clams packed in 16-ounce cans is of little or no value. It is my view that a subsequent declaration of the state of mind that might have existed many months prior to the offering of the testimony is not the character of proof required to establish the price that one would have received or was willing to receive, as contemplated by the statute, when it is shown that such witness never at any time had such, like, or similar merchandise for which he could or would have received or was willing to receive any price. In the case of *Kuttroff* v. *United States*, 14 Ct. Cust. Appls. 381, the Court of Customs and Patent Appeals held:

The most favorable view that can be taken of the Government's testimony as to the American producer's *offer* or as to his *willingness* is to find that the domestic producer forwarded to his branch office, for distribution to the trade, certain catalogues or trade announcements which contained their offer with reference to pontamine fast pink G.

We do not think this is either an *offer*, or an expression or indication of *willingness* within the meaning of the paragraph. A producer who is willing to sell a commodity at a given price ordinarily seeks those who are in a position to buy. He may not reach all of them, but he certainly ought to reach some of them with his expression of willingness.

Another observation of our appellate court as to the scope and meaning of the phrase "would have received or was willing to receive," is found in *Kuttroff* v. *United States*, 14 Ct. Cust. Appls. 176, from which I quote the following:

To establish the price which the producer would have received or was willing to receive it must at least appear that he had something to sell at that price, and also that he had or could produce enough to sell, so that more than two small orders could be filled without exhausting the supply, in a case where the demand was as great as in this case. If this is not so, the mere declaration of a possible producer that he was willing to sell at a named price would enable him to compel an appraisal at a value which did not then exist and might never obtain. In other words, without having anything to sell, without knowing what it would cost to produce the article, he could by mere *fiat* control, to some extent, at least, the course of commerce. [Italics mine.]

According to this record those who attempted to testify as to the price they would have received or were willing to receive for a 16-ounce can of canned clams did not at that time, and apparently never expected to have, a 16-ounce can of canned clams to offer for sale to anyone or upon which they could have expressed any willingness to receive a certain price. Since these witnesses had never had a 16-ounce can of canned clams, they certainly did not have anything to sell at the price to which they attempted to testify they would have received or were willing to receive.

In view of what has been said it is clear that there is no evidence before me upon which I can find the American selling price for the 16-ounce tins of canned clams, and it is also clear that the appraiser was in error in appraising the 16-ounce tins of canned clams upon the basis of the American selling price, he having testified that he based his appraisement upon the American canned clams produced by Burnham & Morrill, and the vice president of Burnham & Morrill having testified that his company never produced a 16-ounce tin of canned clams. However, during the trial of this case counsel for the respective parties entered into the following stipulation:

It is hereby stipulated and agreed by and between counsel for the plaintiff and the Assistant Attorney General, attorney for the United States, that the export value, as said value is defined in section 402, Tariff Act of 1930, of the canned clams covered by the appeals listed below is the invoice value plus ten per centum and that the foreign value, as defined in said section 402 is not higher.

In entering into this stipulation the Assistant Attorney General does not abandon the appraisement based on the "American selling price" as defined in section 402 (g), Tariff Act of 1930, nor admit that the facts so stipulated are material or relevant.

Therefore, accepting the above stipulation as a statement of fact, I find and hold the proper dutiable export value of the 16-ounce tins of canned clams covered by the appeals listed in said schedule A to be the invoice value plus 10 per centum.

This leaves for consideration only the 5- and 8-ounce tins of canned clams covered by the appeals listed in said schedule A. As to these the evidence shows that they are such, like or similar to the 5- and 8-ounce B&M brand tins of canned clams produced and sold by Burnham & Morrill. The appraiser testified that he appraised these canned clams upon the basis of the price received for the B&M brand of Burnham & Morrill's 5- and 8-ounce tins of canned clams when sold by the wholesale dealer to the retail dealer in the San Francisco market. It therefore becomes necessary to inquire whether San Francisco was the principal market for such, like, or similar merchandise, or whether such market was located at some other point or points in the United States.

The record shows that for reasons sufficient unto itself the Burnham & Morrill Co. had divided the United States into five districts or territories, to wit, Pacific Coast territory, Great Lakes territory, New England territory, eastern territory, and western zone. In each of these territories Burnham & Morrill were represented by brokers. In each of these territories, except the Pacific coast and New Orleans, the broker submits a memorandum of sale or order to Burnham & Morrill, and the company then prepares an invoice covering such sale. On the Pacific coast and New Orleans the broker prepares the invoice on behalf of Burnham & Morrill to save time, and then sends a copy to Burnham & Morrill, but in all cases the customer pays Burnham & Morrill in Portland, Maine. As stated by one witness:

Technically we are selling them at B&M's prices because we are selling for their account. We do not sell for our own account.

Although not specifically so stated by anyone, it is clear from the record that these different brokers in the various territories in selling the B&M 5- and 8-ounce tins of canned clams were acting merely as agents for Burnham & Morrill of Portland, Maine. It follows, therefore, that all sales of the B&M brand of the 5- and 8-ounce tins of canned clams were made by Burnham & Morrill at Portland, Maine Since all the sales of the only canned clams which were such, like, or similar to the 5- and 8-ounce tins of canned clams imported were made at Portland, Maine, I find and hold that Portland, Maine, was the principal market for the B&M brand of 5- and 8-ounce tins of canned clams. *Goldmark* v. *United States*, 22 C. C. P. A. 358.

In the case of *Innis, Speiden* v. *United States*, 19 C. C. P. A. 1, our appellate court made the following observation regarding what constituted "the principal market of the United States":

The Baugh Chemical Co., according to the record; is located in Baltimore. Its sales, as shown in the record, are made to various purchasers; chiefly on the Atlantic seaboard—eastern Pennsylvania and New York. Sundheimer also sells from a plant in Baltimore and sells to consumers on the eastern seaboard. The query has been suggested, Is the principal market for this kind of merchandise

where the goods are delivered, or where the goods are made and can be obtained? The principal market is certainly not shown by proof of sales not made in accordance with the provision of the statute. Sundheimer's testimony as to the principal market, is, obviously, based upon his own sales, which sales do not conform to the statutory requirements.

Our attention has been called to no other testimony in the record as to the principal market except that of Sundheimer, and we know of no other. The record also shows that from 20 to 40 per centum of the American-produced commodity is freely offered for sale in the usual wholesale quantities and in the usual course of trade, from a Baltimore plant to various consumers in Pennsylvania and in states other than the states referred to as the principal market by Sundheimer. It seems to us that the principal market where the sales were made in accordance with the provision of the statute, under this record, is at Baltimore.

We think, under the circumstances, the sales price of the Baugh Chemical Co., in the manner described in the testimony and in the findings of the court below, should be accepted as the American selling price, as defined in section 402, *supra,* * * *.

During the trial of this case there was offered in evidence that which counsel for the plaintiffs referred to as "a group of papers which state the prices at which the B&M and the Sealpakt clams, both the 5-ounce and the 8-ounce weight or sizes, were regularly sold in the various markets of the United States," which was received in evidence and marked exhibit 8. The first page of this exhibit shows the prices in the New England market, which includes Portland, Maine, on various dates between January 1934 and May 1939, at which the 5- and 8-ounce tin of B&M canned clams was sold. This exhibit also shows the prices for the same merchandise in other districts or zones, which prices are different from those shown for the New England and Portland, Maine, area.

In explaining these differences in price in the various areas, the vice president of Burnham & Morrill testified as follows:

The price and the condition of the sale on the Pacific Coast were as follows: In that market, and because that territory is supplied out of warehouse stock, and stock enroute to the Pacific Coast by steamer, and because we consider the Pacific Coast as a unique territory in itself, West of the Rockies, we sell at ex-warehouse prices in the cities of Los Angeles, San Francisco, Oakland, Portland, Tacoma and Seattle. These prices are delivered ex-warehouse, and the premium added to the basis on which we sell in the East is a premium intended to cover miscellaneous charges, costs of getting the goods to the established market, the same as any packer or distributor would have to pay in order to lay his goods down for sale and distribution in that market; in other words, freight, insurance, toll, wharfage, handling, and a margin to cover warehouse storage, strikes, civil riots, insurance, and also a very small discount for withdrawal ex-dock rather than from ex-warehouse.

A similar situation existed between the New England and Portland, Maine, prices and the prices for the other areas hereinbefore referred to. Since the prices charged by Burnham & Morrill for their 5- and 8-ounce can of clams in the Pacific coast, Great Lakes, eastern, and western districts or territories included, in addition to the price of the merchandise itself, such charges as freight, insurance, toll, wharf-

age, handling, and a margin to cover warehouse storage, strikes, and civil riots, such price is not the price contemplated by section 402 (g) of the act of 1930. The pertinent part of that section is as follows:

The American selling price of any article manufactured or produced in the United States shall be the price, including the cost of all containers and coverings of whatever nature and *all other costs, charges, and expenses incident to placing the merchandise in condition packed ready for delivery,* * * *. [Italics mine.]

Therefore, the appraiser was in error when he adopted and used as the value of the 5- and 8-ounce cans of clams in these appeals the price at which Burnham & Morrill sold their 5- and 8-ounce can of clams in the San Francisco territory. In fact a comparison of the values found by the appraiser for the the 5- and 8-ounce cans of imported clams with the price at which Burnham & Morrill sold their 5- and 8-ounce can of clams in the San Francisco market shows that the appraiser did not in fact use the Burnham & Morrill prices in San Francisco as the value for the imported merchandise.

After carefully considering the entire record, including an examination and inspection of the exhibits and samples, as well as the briefs filed by counsel for both parties, for the reasons hereinbefore stated, I find and hold the American selling price of the 5- and 8-ounce clams covered by the appeals listed in said schedule A to be the values set out in schedule C, hereto attached and made a part hereof, for the respective dates therein indicated. Judgment will be rendered accordingly.

---

*Schedule C*

The following is the American selling price of the 5- and 8-ounce cans of clams on the various dates listed.

*5 ounce*

| | | |
|---|---|---|
| Jan. 1, 1934 to May 31, 1935 | $1.00 | Per dozen, less 1½% discount for cash. |
| June 1, 1935 to Nov. 30, 1936 | .90 | |
| Dec. 1, 1936 to Apr. 30, 1937 | .95 | |
| May 1, 1937 to May 31, 1939 | 1.00 | |

*8 ounce*

| | | |
|---|---|---|
| Jan. 1, 1934 to Oct. 31, 1934 | $1.55 | Per dozen, less 1½% discount for cash. |
| Nov. 1, 1934 to May 31, 1935 | 1.60 | |
| June 1, 1935 to Nov. 30, 1936 | 1.50 | |
| Dec. 1, 1936 to Feb. 28, 1937 | 1.60 | |
| Mar. 1, 1937 to Mar. 31, 1939 | 1.65 | |