UNITED STATES *v.* MUTUAL SUPPLY CO. ET AL.

and

MUTUAL SUPPLY CO. ET AL. *v.* UNITED STATES

No. 5950.—Invoices dated Yokohama, Japan, February 7, 1940, etc. Entered at San Francisco, Calif., March 4, 1940, etc. Entry No. 6693, etc.

Third Division, Appellate Term

(Decided November 10, 1943)

*Paul P. Rao,* Assistant Attorney General (*Samuel D. Spector,* special attorney) for the United States.
*Lawrence & Tuttle* (*George R. Tuttle* of counsel) for the importers.
*Joseph Lockett, amicus curiae.*

Before CLINE, KEEFE, and EKWALL, Judges

KEEFE, Judge: These applications for review involve importations of baby clams, packed 5, 8, and 16 ounces to the can, and white clams, packed 8 ounces to the can, shipped from Japan between October 1938 and February 1940. The clams were entered to meet advances by the appraiser in previous cases at the American selling prices of competitive articles produced in the United States, under the provisions of section 402 (g) of the Tariff Act of 1930. Clams became the subject of appraisement upon the basis of the American selling price by reason of a proclamation by the President of the United States, as promulgated and published in T. D. 47031, issued

under and by virtue of section 336 of the Tariff Act of 1930, after investigation by the Tariff Commission. In such proclamation it was decreed that in order to equalize the differences in the cost of production between the foreign article and any like or similar domestic article, assessment of duty at 35 per centum ad valorem under paragraph 721 (b) of the Tariff Act of 1930, on clams other than razor clams and clams in combination with other substances (except clam chowder), packed in airtight containers, shall be taken upon the basis of the American selling price, as defined in section 402 (g) of said act.

It was stipulated and agreed between the parties before the trial court that the export values of the canned clams are represented by the invoice values plus 10 per centum and that the foreign values are not higher.

Considerable testimony was introduced below (1) as to whether or not any American products were like or similar to the imported products; (2) as to the principal market for the clams used as a measure of value by the appraiser; and (3) as to the values thereof in such market upon the various dates of shipment of the clams imported herein.

The plaintiffs below contended that if the clams contained in 5- and 8-ounce tins were to be valued at American selling prices the principal market therefor is the Boston district rather than San Francisco and the values in such market on the dates of shipment herein should prevail; that the clams in 16-ounce cans should not have been appraised on the basis of the American selling price because clams in such sized cans had not been sold or offered for sale by a producer in the United States and the defendant had failed to establish the price which an American producer would have been willing to receive for such merchandise at the time of exportation; and that none of the clams imported herein was like or similar to any article produced in the United States and therefore the export value was the proper basis of appraisement.

The court below held, first, that the clams packed 5 and 8 ounces to the can were dutiable upon the basis of the American selling price of "such, like, or similar" competitive domestic clams as produced and sold by Burnham & Morrill Co. of Portland, Maine, under their B & M brand, and that the principal market for B & M brand clams, packed 5 and 8 ounces to the can, was at Portland, Maine; second, that export value was the proper basis upon which to measure the dutiable value of clams packed in 16-ounce cans, and that such value was represented by the invoice prices plus 10 per centum, as per stipulation, *supra*, the court stating:

that no such, like, or similar clam was canned and sold in the United States and

testimony as to what they would have received or were willing to receive for clams packed in 16-ounce cans is of little or no value.

The importer-appellant contends that the export values are the dutiable values and that the trial court erred in finding that the baby and the white clams were similar to Burnham & Morrill Co.'s B & M brand of clams, and in holding such imported clams dutiable upon the basis of the American selling price. Alternatively, it is further contended that, if the imported clams in 5- and 8-ounce cans are dutiable upon the basis of the American selling price, like or similar American articles are more closely represented by Burnham & Morrill Co.'s cheaper Sealpakt brand than by their B & M brand.

The Government-appellant contends that the court below erred in holding that Portland, Maine, was the principal market for the 5- and 8-ounce cans of clams and in adopting the values in such market as the American selling prices to be used as a basis of value of the imported clams; that the lower court erred in not holding that the price the American manufacturer, producer, or owner would have received or was willing to receive for 16-ounce cans of canned clams, when sold in the ordinary course of trade and in the usual wholesale quantities at the time of exportation of the imported article, was the American selling price for duty purposes, and that by reason of the proclamation, *supra*, clams *must* be appraised on the basis of the American selling prices of like or similar clams.

After a careful consideration of the voluminous record and the many exhibits admitted in evidence in this case, we are in agreement with the lower court's holding that the 5- and 8-ounce cans of clams, invoiced as baby clams and white clams, as here imported, are like or similar to the soft clams packed by Burnham & Morrill Co. under their B & M brand. There is nothing appearing in the evidence to establish that the imported articles were culls such as used by Burnham & Morrill in their Sealpakt brand products. In fact, some of the witnesses were of the opinion that the imported clams were superior to the B & M brand clams.

With reference to the principal market of canned clams in the United States, the importers established that Burnham & Morrill Co. sell their merchandise, including canned clams, throughout the United States; that the majority of sales are made through brokers, working on commission, designated by the company to be in charge of their different territories; and that with the exception of the Pacific Coast and New Orleans territories the invoices are made out at Portland, Maine; that on the Pacific Coast the broker sells merchandise, either in the local warehouse or en route to that point, makes out the invoice on behalf of Burnham & Morrill, sends the original of the invoice to the customer and a copy to the home office, and the customer pays Burnham & Morrill at Portland, Maine, in accordance with the bill

or invoice supplied by the broker. The Burnham & Morrill Co. also sells to wholesale distributors who redistribute to other retail units and to chain stores large enough to maintain a warehouse, who also redistribute to their retail units; and that some sales are made direct to such chain-store customers who use substantial quantities.

To illustrate the different prices in the various markets the evidence disclosed that in Portland, Maine, a 5-ounce can of clams during the year 1940 was sold at a price of $1 per dozen, f. o. b. Portland; that the price of such clams during the same period in the Pacific Coast market was $1.15; that there was also a middle zone known as the Great Lakes market, supplied from warehouses located in Chicago, Detroit, and Milwaukee, and that, with sales conditions the same as on the Pacific Coast, the price of a 5-ounce can of clams during the year 1940 was $1.10 per dozen; that the premium added to the basic prices at which the merchandise is sold in the East is intended to cover miscellaneous charges, "cost of getting the goods to the established market," the same as any packer or distributor would have to pay in order to lay his goods down for sale and distribution in that market, such as freight, insurance, toll, wharfage, handling, and a margin to cover warehouse storage, strikes, civil riots, and also a very small discount for withdrawal ex dock rather than from ex warehouse. As to the wholesale quantity, the evidence discloses that not less than 5 cases were considered, and that the price in each particular market is not governed by the quantities sold.

The evidence further disclosed that the Underwood Co., a competitor of Burnham & Morrill Co. in the packing business, also packs clams which are sold nationwide through brokers on a commission basis, except in the New England market where sales are conducted through the home office and two direct salesmen.

The plaintiffs also established the relative quantities of B & M and Sealpakt brands of clams which Burnham & Morrill Co. sold at wholesale either directly or through their commission merchants in various parts of the United States.

The examiner of the merchandise also testified for the plaintiffs. In appraising the merchandise he used as comparable merchandise an eastern Maine clam packed by either Burnham & Morrill or by Underwood, whichever was higher in price, according to price catalogs issued by wholesalers in San Francisco nearest to the dates of shipment, these catalogs varying in price every 3 months. According to the examiner the prices of clams packed by Burnham & Morrill and by Underwood are the same. He could remember but one instance where there had been a variation in price. Upon the question of principal market the witness testified as follows:

Judge Tilson: What did you refresh your mind on before?

The Witness: On catalogs issued by the various wholesale grocers. *The way I obtained information on American selling price is to contact a wholesaler in*

*San Franc.'sco, based on the merchandise sold in the principal market.*  The canner I couldn't tell you.  Perhaps Underwood might have been the canner, and I couldn't tell you except by the label, and type of clam.  I couldn't tell you where it came from.  [Italics not quoted.]  Record page 27.

Q.  Would you tell us then, having knowledge, as I take it, only of the selling price in San Francisco, how you ascertained that San Francisco was the principal market for that clam?

    \*      \*      \*      \*      \*      \*      \*

The WITNESS:  I know I was notified by the United States appraiser in San Francisco that San Francisco was the principal port, held by the Tariff Commission, and I have sent various C. I. E.'s to New York, that San Francisco is the principal market for clams.

Q.  Just for clams generally?—A.  Yes.

Q.  How many types of clams are you familiar with?—A.  Of the domestic?

Q.  Of American clams.—A.  Only the Eastern clam, the Burnham & Morrill that is, Underwood, and I can't remember the names of the different kinds of whole butters.  Record page 28 and 29.

The canned clams imported herein are subject to appraisement upon the basis of the selling price of Maine clams in the principal market of the United States.  The appraiser has found San Francisco to be the principal market for such clams.  The prices returned by him as representing the value for duty purposes are based upon quotations made to retailers in San Francisco in the wholesalers' trade catalog.  We have nothing before us relative to the activity of buying and selling in the San Francisco market, either among various wholesalers in their transactions with retailers, nor evidence of the number of sales or offers for sale made during the periods of exportation in question by the eastern packers to wholesalers in the ordinary course of trade.  True, the evidence establishes the quantities sold during the periods in question by one of the eastern packers, to wit, Burnham & Morrill Co., in various communities throughout the country, including San Francisco.  Quantities sold, however, have no bearing upon the activity of buying and selling a commodity in a particular market.  Sales or offers for sale are necessary to establish principal market.  It might well occur that a quantity far in excess of the usual wholesale quantity would be covered by one sale, whereas a smaller amount of goods may have been sold in the usual wholesale quantities in another community in a sufficient number of transactions to become a majority of sales necessary to establish a principal market.

The evidence discloses that both of the eastern packers of clams sell in the same manner, that is, all of their merchandise is freely offered for sale and sold throughout the United States by the packers' various agents upon a commission basis and such transactions are made either from the home office or under its control.  The prices prevailing in various parts of the country are likewise regulated by the packers in such manner that they receive a uniform return for their goods, whether the same is sold in New England or San Francisco.  Variation in prices in the different sections of the country is caused by the costs

of freight, insurance, toll, wharfage, handling, and other charges. Agents of the packers selling locally would not, through the number of their sales alone, establish a principal market unless such sales were made from such locality throughout the country. From all that appears in the record, the packers' representatives merely sold locally. The price differential between eastern and western sales is the result of costs incurred after the merchandise is *"packed ready for delivery."* Under the definition of value in section 402 (g) of the Tariff Act of 1930, such charges are not a part of the American selling price. Such price only includes:

\* \* \* the cost of all containers and coverings of whatever nature and all other costs, charges, and expenses incident to placing the merchandise in condition *packed ready for delivery,* \* \* \*. [Italics not quoted.]

The "delivery" of course is from the principal market. However, it is well established that the *principal market* is where sales are made to the various purchasers, that is, where merchandise is sold as distinguished from a place where merchandise is delivered for sale. Here, the canned clams were delivered by the packers to San Francisco for sale by their agents. We are of the opinion that there is substantial evidence in the record to establish that Portland, Maine, is the principal market for canned clams under the law as announced by the courts. (See *United States* v. *Hallet & Carey Co.*, 68 Treas. Dec. 1286, Reap. Dec. 3668; *Adolph Goldmark & Sons Corp.* v. *United States*, 22 C. C. P. A. 358, T. D. 47378; and *Innis, Speiden & Co. et al.* v. *United States*, 19 C. C. P. A. 1, T. D. 44789.)

We find from the evidence that the American selling price of canned clams in the principal market of the United States, packed in 8-ounce cans was $1.65 per dozen less 1½ per centum cash discount; and that the price of canned clams packed in 5-ounce cans was $1 per dozen, less 1½ per centum cash discount.

The question remaining for decision is whether or not canned clams in 16-ounce cans were correctly appraised on the basis of the American selling price, and whether or not the lower court erred in not holding that the price the American manufacturer, producer, or owner would have received or was willing to receive for clams in 16-ounce cans was the American selling price for duty purposes.

The trial court in holding that there was not an American selling price for clams packed in 16-ounce cans relied upon the cases of *Kuttroff* v. *United States*, 14 Ct. Cust. Appls. 381, T. D. 42032, and *Kuttroff* v. *United States*, 14 Ct. Cust. Appls. 176, T. D. 41698. In the foregoing cases the American producers either had none of the commodities on hand at the time of exportation of the foreign product there in question, or were unable at such time to deliver the materials in wholesale quantities. Here, however, a demand for the product in 16-ounce cans could have been met immediately because the clams,

the product at issue here, were on hand, and a willingness to sell in such packages existed. In our opinion, the clams and not the containers become the essential feature of the proclamation, and it is immaterial whether or not the containers containing like or similar clams are of the size of the competitive imported clams.

In the case of *United States* v. *Meyer Bros. Drug Co.*, Reap. Dec. 2874, this court, relative to the manner in which competitive American products were packed, stated:

> The definition of American selling price does not state that the American product should be packed in the same manner as the imported product. It is our opinion, however, that comparison should be made on the basis of approximately similar packing.

Clams packed in 5- and 8-ounce cans offered for sale and sold in the United States, having been found like or similar to the clams imported herein insofar as such clams are contained in 5- and 8-ounce cans, it follows that the same clams, if packed in 16-ounce cans, would also have been like or similar to the imported clams.

Inasmuch as clams were not packed in this country in 16-ounce cans, testimony of the packer was offered to establish the price which the manufacturer would have received or was willing to receive for clams in such packages at the time of exportation of the clams here. The judge presiding at the trial, however, sustained the objection of plaintiff to such testimony. At a subsequent hearing an agent of the packer was permitted to testify as to the price at which the packer would have been willing to sell clams in such packages. In our opinion the testimony there adduced is of little weight, inasmuch as it was not established that the price stated was in accordance with the definition thereof in paragraph 402 (g).

Being of the opinion, however, that clams if packed in the United States in 16-ounce cans are like or similar to the imported clams, duty is assessable thereon upon the basis of the American selling price, and as nothing appears in the record sufficient to establish an American selling price different from the price returned by the appraiser, which is presumptively correct, we hold that the American selling price of canned clams packed in 16-ounce cans is as returned by the appraiser.

From a careful consideration of the record before us, we find as facts, as follows:

1. That the imported merchandise, invoiced as baby clams and white clams, contained in 5-ounce, 8-ounce, and 16-ounce cans, are like or similar to soft-shelled clams packed in Maine, as represented by the B & M brand and sold by Burnham & Morrill of Portland, Maine.

2. That by reason of the proclamation of the President, T. D. 47031, the imported merchandise, canned clams, is subject to appraisement upon the basis of the American selling price.

3. That the principal market for canned clams like or similar to the clams imported herein is Portland, Maine.

4. That the American selling price of canned clams in 5-ounce cans was $1 per dozen less 1½ per centum cash discount; in 8-ounce cans was $1.65 per dozen less 1½ per centum cash discount; and in 16-ounce cans was the price returned by the appraiser.

From such facts we conclude the decision and judgment of the lower court is reversed insofar as it held that canned clams in 16-ounce cans are not subject to appraisement upon the basis of the American selling price; and that said decision of the lower court is affirmed insofar as it is held that the canned clams imported herein are like or similar to the soft-shelled canned clams packed by Burnham & Morrill of Portland, Maine, and that Portland, Maine, is the principal market for such clams in the United States.

Judgment modifying the judgment of the lower court will be entered accordingly.