---

KUTTROFF, PICKHARDT & Co. (INC.) *v.* UNITED STATES (No. 2638) [1]

UNITED STATES VALUE—AMERICAN SELLING PRICE—APPRAISEMENT OF COAL
TAR DYE—COMPETITIVENESS.

Whether or not merchandise is "freely offered for sale to all purchasers" (sec. 402 (d) and (f), Tariff Act of 1922) must depend upon the number of purchasers and the demand. It should at least appear that some reasonable quantity of the offered article was ready, or could be produced, for reasonably prompt delivery. The existence of the article should be advertised, mentioned, made known, or called to the attention of potential customers. To establish "the price that the [American] manufacturer, producer, or owner would have received or was willing to receive," (f) it must at least appear that he had something to sell at that price, and also that he had, or could produce, enough to sell, so that two small orders aggregating 223 pounds would not exhaust the supply where the foreign goods were sold in this country in lots, usually of 500 to 1,000 pounds, aggregating about 12,000 pounds for the six months immediately preceding this importation. There was no substantial · evidence to support the finding of the court below that the American dye, known

1 T. D. 41698.

as Sulfanthrene Pink F. F. Paste, produced to compete with a German coal tar dye known as Hydron Pink F. F. Paste, was freely offered for sale to all purchasers in the ordinary course of trade and in the usual wholesale quantities on or before the time the goods at bar were imported. Accordingly, appraisement of the German dye should have been made at the United States value ((d) *supra*), rather than the American selling price (f) *supra*.

## United States Court of Customs Appeals, May 29, 1926

APPEAL from Board of United States General Appraisers, G. A. 9004, T. D. 40926

[Reversed and remanded with instructions.]

*Barnes, McKenna & Halstead* (*Albert McC. Barnes* of counsel) for appellant.
*Charles D. Lawrence,* Assistant Attorney General (*Oscar Igstaedter,* special attorney, of counsel), for the United States.
*John G. Lerch, amicus curiae.*

[Oral argument April 2, 1926, by Mr. Barnes, Mr. Igstaedter, and Mr. Lerch]

Before GRAHAM, Presiding Judge, and SMITH, BARBER, BLAND, and HATFIELD, Associate Judges

BARBER, Judge, delivered the opinion of the court:

This is an appeal by importer from a reappraisement by the Board of General Appraisers.

The imported merchandise is a coal-tar dye known as Hydron Pink F. F. Paste. It was exported from Germany May 4, 1923, and entered at New York June 8 following at the United States value of $2.32 per pound less certain deductions under the provisions of subdivision (d), section 402 of the Tariff Act of 1922.

It is sufficient for the purposes of this case to note that said subdivision (d) defines the United States value to be—

The price at which such or similar imported merchandise is freely offered for sale, packed ready for delivery, in the principal market of the United States, to all purchasers, at the time of exportation of the imported merchandise, in the usual wholesale quantities, and in the ordinary course of trade—

with certain deductions not here in question.

There is no contention that the provisions of this subdivision are not applicable to the importation if the American selling price thereof, as set out in subdivision (f) of the same section, does not apply.

Subdivision (f) is as follows:

The American selling price of any article manufactured or produced in the United States shall be the price, including the cost of all containers and coverings of whatever nature and all other costs, charges, and expenses incident to placing the merchandise in condition packed ready for delivery, at which such article is freely offered for sale to all purchasers in the principal market of the United States, in the ordinary course of trade and in the usual wholesale quantities in such market, or the price that the manufacturer, producer, or owner would have received or was willing to receive for such merchandise when sold in the ordinary course of trade and in the usual wholesale quantities, at the time of exportation of the imported article.

The local appraiser appraised the merchandise thereunder at the American selling price of $2.70 per pound of Sulfanthrene Pink F. F. Paste manufactured by E. I. du Pont de Nemours Co., of Wilmington, Del., with which, for the purposes of this case, importer concedes the imported dye is competitive.

Importer appealed to reappraisement by a single general appraiser. At the hearing before him, the Government conceded that the American selling price of the domestic dye, when adjusted on the basis of the comparative strength of the two dyes, should have been $2.25 less 2 per centum, instead of $2.70 per pound.

The single general appraiser sustained the entered value. The Government appealed to the Board of General Appraisers. That tribunal made the following findings of fact:

(1) The instant merchandise is an imported coal-tar product.

(2) The instant merchandise consists of Hydron Pink F. F. Paste.

(3) The instant merchandise was exported from Germany on May 4, 1923.

(4) The instant merchandise was competitive with Sulfanthrene Pink F. F. Paste manufactured in the United States; that is to say, the instant merchandise accomplishes results substantially equal to those accomplished by Sulfanthrene Pink F. F. Paste, the domestic product, when used in substantially the same manner.

(5) The instant merchandise was equal in strength with the competitive article manufactured in the United States, Sulfanthrene Pink F. F. Paste.

(6) The principal market of the United States for such competitive article, Sulfanthrene Pink F. F. Paste, was Charlotte, N. C.

(7) The American selling price of such article, Sulfanthrene Pink F. F. Paste, was in the ordinary course of trade and in the usual wholesale quantities in such principal market, upon the date of exportation of the instant merchandise, $2.25 per pound, less 2 per cent discount.

We therefore find the dutiable value of the merchandise was $2.25 per pound, less 2 per cent discount.

In view of importer's concession, the important questions standing for decision, and to which arguments of counsel are directed, are whether the above findings are sufficient to support the judgment below, and if so, is there any substantial, competent evidence to support the same.

Importer contends that there is no such evidence to support the sixth finding; that the seventh finding is not one of fact but a conclusion of law, no finding having been made as to whether or not the domestic dye was freely offered for sale to all purchasers in the place which the board found to be the principal market of the domestic dye.

It is clear that there is no finding that the American-produced dye was freely offered for sale to all purchasers in the principal market, unless it may be implied in what is stated in the seventh finding, and we think the case might be remanded for an explicit finding in this respect. In view of the record, however, we dispose of that question

here, pursuing a course similar to that adopted in *Sandoz Chemical Works* v. *United States*, 13 Ct. Cust. Appls. 466, T. D. 41365.

There is no controversy as to the price at which the domestic dye was sold in such sales thereof as were made prior to May 4, 1923, and it appears that the Du Pont Co. was then the sole producer of that dye.

At the hearing before the single general appraiser the importer, to support its appeal, introduced testimony as follows:

Mr. Willmarth, the purchasing agent for 12 years of Marshall Field & Co., of Chicago, testified that he had been purchasing dyes of both American and foreign manufacture for some 10 years; that Marshall Field & Co. maintained mills in the United States wherein textiles were manufactured and dyes used; that they used some 6,000 pounds a year of the imported merchandise; that they bought in quantities of from 500 to 1,000 pounds; that 1,000 pounds was the usual wholesale quantity thereof; that prior to May 4, 1923, they had received offers of dyes manufactured by the Du Pont Co.; that Sulfanthrene Pink F. F. Paste was not offered to them before that date by anyone; that he did not see any price lists, catalogues, or advertisements offering that dye for sale prior to that date; that no salesman of the Du Pont Co. came to him with it before then; that he never heard of its existence until June 15, 1923, when it was offered by a Du Pont Co. salesman; that one reason he did not buy it of that company was because they could not deliver in the quantities desired.

Mr. Packard, one of the purchasing agents for the Amoskeag Manufacturing Co., located at Manchester, N. H., testified that that company had been in business since about 1832 in the manufacturing of textiles and used large quantities of dyes; that it used approximately 4,000 pounds of the imported dye, beginning the latter part of 1922; that during the year 1923 it used over 40,000 pounds of colors, buying in 10,000-pound lots; that prior to May 4, 1923, it received numerous offers of dyes from various dealers in dyes of domestic manufacture, including salesmen of the Du Pont Co.; that prior to that date no salesman of that company or anyone else offered Sulfanthrene Pink F. F. Paste; that he examined price lists, catalogues, advertisements, etc., offering different dyes in the trade and before that date did not remember seeing any advertisements of the sulfanthrene pink.

Mr. Evans, superintendent of the Bates Manufacturing Co., of Lewiston, Me., which manufactures textiles, testified that his company used the imported dye to the extent of approximately 500 pounds per month when running full; that it purchased the same in 1,000-pound lots or better; that before May 4, 1923, it received offers of dyes from salesmen of the Du Pont Co., but did not receive from

them any offers of the domestic dye before that date, nor from anyone else; that he examined magazines, price lists, and catalogues of dyes of domestic manufacture and before that date never saw any offer of the domestic product; that the name sulfanthrene pink was not known to him before that date; that a barrel of the dye would contain between four and five hundred pounds; that for regular work they would not buy less at a time, but for trial orders would consider about 25 pounds.

Mr. Bradley, the purchasing agent of the Pacific Mills, with mills at Lawrence, Mass., Dover, N. H., and Columbia, S. C., testified that his company used large quantities of dyes, and in the year 1923 about 2,000 pounds of the imported dye; that dyes manufactured by the Du Pont Co. were offered to him before May 4, 1923; that sulfanthrene pink was not so offered by anyone; that before that date he never received any information from any source that that article was made or offered for sale by the Du Pont Co.; that he never asked for prices in less than barrel lots; that he thought he bought 2,000 pounds of the foreign dye the last part of 1922.

Mr. Pickhardt, secretary and general manager of the importer, testified that he had been in its employ for many years and had the direction of its salesmen who covered the entire country; that the usual wholesale quantity in which the imported dye was sold was from 500 to 1,000 pounds; that from 10 to 100 pounds was not a wholesale quantity; that the principal market in the United States for dyestuffs was New York City; that he never saw an advertisement of the Du Pont Co. in any trade magazine offering Sulfanthrene Pink F. F. Paste to the trade prior to May 4, 1923, and he produced some trade magazines in connection with his testimony. In these are advertisements over the name of the Du Pont Co. specifying various dyes, but Sulfanthrene Pink F. F. Paste is not included therein. One of the journals is under date of June, 1923, and the other May 19, 1923.

Mr. Kalbach, a sales manager of the importer, testified that it was a very large dealer in both foreign and domestic dyes; that for six months immediately prior to May 4, 1923, it sold some 12,000 pounds of the imported dye; that it was on the market more than a year prior to May, 1923, and that the usual wholesale quantity thereof was from 500 to 1,000 pounds; that prior to May 4, 1923, it received offers of domestic dyes from various sources but no offer of sulfanthrene pink; that he had communication by correspondence or telephone with Du Pont salesmen about once a week; that importer bought from the Du Pont Co. in 1923 dyes in barrel lots, some of them more than tons; that the Du Pont salesmen never offered him sulfanthrene pink; that no one offered it to him prior to May 4 nor did he before that date ever see it advertised or know that it existed;

that he first heard that the Du Ponts announced the sale of sulfanthrene pink perhaps in June, 1923, through one of importer's salesmen.

Mr. Pickrell, who had charge of the importation of dyes on behalf of H. A. Metz & Co., of New York, testified that that company was an importer of dyes and also handled those of domestic manufacture, more of domestic than foreign; that in 1923 that company sold 57,000 pounds of the imported dye; that it was part of his business to ascertain whether there were any dyes of American manufacture which were competitive with foreign dyes; that in doing this he kept card indexes showing all noncompetitive colors which were compiled or prepared from a list published and disseminated by the appraiser's office; that he constantly perused journals and trade papers for advertisements of domestic manufacturers and importers of colors that were offered for sale; that prior to May 4 he understood Hydron Pink F. F. was noncompetitive, based on information he obtained at the appraiser's stores; that prior to that date he had never seen an advertisement in any trade paper or periodical advertising any color similar to the imported merchandise and had not received any information from salesmen of his company or from its branch offices that any domestic manufacturer was offering in this country a color which would be considered similar to the imported merchandise; that he attended to the entry of importations by his company in which it was important for him to know what foreign dyes were competitive with those of domestic production; that he never heard of the existence of the domestic dye before May 4, 1923; that Mr. Wolff, a customs examiner, told him that hydron pink was placed on the competitive list on or after the 9th of July, 1923.

Mr. Wolff, the customs examiner who passed the importation in question testified that there was, at the time the entry was made, a list of noncompetitive dyes on file in the appraiser's office. He testified, and it appears therefrom, that the imported dye was on that list and that so far as his office knew, Hydron Pink F. F. Paste was noncompetitve, not only on May 4 but on May 25, 1923. It further appears from his testimony that it was not until some time later, and apparently as a result of a laboratory test at the appraiser's office, that the imported dye was regarded there as competitive with sulfanthrene pink.

To establish that the imported dye should be appraised under said subdivision (f) the Government called Mr. Riper and Mr. Dabbs, who were in the employ of the Du Pont Co.

Mr. Riper testified that he was assistant to the sales director of the dyestuffs department of that company, familiar with its dye products and sales thereof; that the company had seven branch managers located, respectively, at Charlotte, N. C., New York City, Providence, Boston, Philadelphia, Chicago, and San Francisco and

employed 30 salesmen in selling its dyestuffs; that Sulfanthrene Pink F. F. Paste was first produced by the Du Pont Co. in the latter part of January, 1923, but in what amount he did not state; that in the first part of April of that year there was a conference of the sales director and branch office sales managers at which time it was announced by the former that Sulfanthrene Pink F. F. Paste was available and that the sales managers were to go back to their branch offices and offer it; that April 17 there were sold and delivered 10 pounds and on April 25, 1923, 213 pounds of that dye; that in his opinion one pound was a wholesale quantity, although he did not say that it was the usual wholesale quantity; that the principal markets for Sulfanthrene Pink F. F. Paste on May 4, 1923, were at Stanley Creek, and at Spindale, N. C.; that 200 pounds thereof was a wholesale quantity on that date; that most of the dyestuffs produced by the Du Pont Co. were sold in the East from the South up through New England and as far west as Chicago; that his office was located at Wilmington, Del., as was the office of the sales director of the company.

Mr. Dabbs testified that he was the assistant sales manager in charge of the southern district for the Du Pont Co., having his office at Charlotte, N. C.; that on April 17, 1923, he made a sale of 10 pounds of the domestic dye to a textile manufacturer at Stanley, N. C., a place of from 1,500 to 2,000 people; that such manufacturer had turned over all his dye business to him; that he called him on the phone from his office, told him he had sulfanthrene pink for sale; that he needed the pink in the line of goods he was making and thereupon shipped and billed it to him; that he did not at that time offer to sell him any more; that this manufacturer had not before then been a user of vat pinks in which general designation sulfanthrene pink is included; that this was the first time he had ever used it; that on April 25, he sold 213 pounds of the domestic product to Stone Cutter Mills at Spindale, N. C., a place of about 3,000 people. He also testified that on February 14, 1923, he sold another order of vat pink to the same mills. He did not testify that it was sulfanthrene pink and as this sale was prior to the time when the Du Pont agents were directed to sell the latter, and as Riper testified that only 223 pounds of sulfanthrene pink were sold before May 4, we think it is clear that it was not a sale of that article. The Government does not contend that it is. Dabbs further testified that his territory began in Virginia, extended to the Gulf of Mexico and through Texas, excluding Kentucky; that he did not offer throughout this territory sulfanthrene pink prior to May 4, 1923; that each of his salesmen had a price book; that sulfanthrene pink was not quoted in the price book which any of his salesmen had prior to that date; that he was familiar with the advertisements that were inserted in his section

of the country in magazines, newspapers, and trade journals, and that sulfanthrene pink was not offered there prior to May 4, 1923, freely to the trade in any such papers, magazines, or journals; that he did not think that was the usual method of offering such merchandise by dyestuff manufacturers; that his offers of the sulfanthrene pink prior to May 4, 1923, were confined to the two sales mentioned; that he did not offer it to anybody else because there was no more at his disposal; that the Du Pont factory was at Carney's Point, Del.

The Government also called Mr. Metz, president of a company dealing in hydron pink products and which sold Hydron Pink F. F. Paste. He produced a list of the sales of that or equivalent dyes made by his company from March 8, 1922, to May, 1923. The list shows that prior to May 4, 1923, his company made 57 sales of these dyes, 34 of which were in quantities of 400 pounds or more, 12 of which were for 1,000 pounds each. Three sales were of 300 or more but less than 400 and 7 were 100 pounds or more but less than 300. The remaining sales varied from 5 to 50 pounds. He did not testify what, in his opinion, was the wholesale quantity of the merchandise, but did say that some of the 5 and 50 pound sales were trial lots.

None of the other salesmen of the Du Pont Co. was called as a witness and no sales or offers to sell sulfanthrene pink on or before May 4, 1923, were shown or claimed, other than the two hereinbefore referred to.

We have recited this testimony at so much length, not for the purpose of determining any fact that rests upon conflicting evidence, but to ascertain if any finding can be made that Sulfanthrene Pink F. F. Paste was freely offered for sale on or before May 4, 1923, within the meaning of subdivision (f).

It may be noted in this connection that there is no direct conflict between the testimony of the witnesses called by the respective parties unless it be as to the place of principal market.

Subdivision (d) of section 402 provides that, in order to apply the United States value, the merchandise must be freely offered for sale, to all purchasers, in the principal market, in the ordinary course of trade, in the usual wholesale quantities. Such also are the provisions of subdivision (f) as to the American selling price, thereby establishing that the same conditions must exist, in these respects, in order to justify the appraisal under either of these subdivisions.

We do not think the record contains any competent, substantial evidence from which it can be found that Sulfanthrene Pink F. F. Paste was freely offered for sale to all purchasers in the ordinary course of trade and in the usual wholesale quantities on or before May 4, 1923.

The testimony which we have recited furnishes about all, and the best, argument that is necessary upon that question.

Whether or not merchandise is freely offered for sale to all purchasers must depend upon the demand therefor and the number of purchasers thereof. Sulfanthrene pink, apparently, was produced to compete with imported hydron pink for which there was a large demand, by numerous purchasers, in wholesale quantities, such quantities largely exceeding the entire production of sulfanthrene pink prior to the date of exportation of the hydron pink in this case. How can it be thought that only 223 pounds, produced between January and April or May, could furnish any real competition with the imported article? Congress evidently meant to encourage the production of new dyes in this country, but can it be that it intended that the appraisal of an article imported in large quantities and for which there was a great demand, should be upon the basis of the selling price of two sales only of a competitive article, the supply of which was exhausted before the importation was made?

To freely offer an article for sale within the contemplation of subdivision (f) it should, at least, appear that some reasonable quantity of the offered article was ready or could be produced for reasonably prompt delivery. The existence of the article should be so advertised, mentioned, made known, or called to the attention of potential customers that they might or could learn that it was possible to procure the same. *Sandoz Chemical Works* v. *United States*, 13 Ct. Cust. Appls. 466, T. D. 41365; *Kuttroff, Pickhardt & Co.* v. *United States*, 12 Ct. Cust. Appls. 299. It would be natural to expect also that customs authorities would be informed of its existence.

We can not think that two sales of the sulfanthrene pink, in a place remote from the chief users of that article, even if it be assumed, which we do not, that such sales were in the usual wholesale quantities in the ordinary course of trade, satisfy the requirements of subdivision (f).

The assembling of the sales agents of the Du Pont Co., as shown by the testimony, the information given them that the domestic article was available with the direction that they should go forth and offer it for sale, in view both of what was done and what was *not* done as a result thereof, is equally unconvincing. It tends to show that there was no real intent on the part of the Du Pont Co., and that it did not possess the ability to offer the new dye for sale to all purchasers before May 4, 1923.

We do not consider whether any alternative finding could, on the evidence, be made that the price at which sulfanthrene pink was sold in this case was the price the producer would have received or was willing to receive therefor when sold in the ordinary course of trade, in the usual wholesale quantities, which in *Kuttroff, Pickhardt & Co.* v. *United States*, 13 Ct. Cust. Appls. 17, T. D. 40861, was held might, if made, justify the application of subdivision (f), because

there is no proof thereof here except the two sales mentioned and the fact that the price at which these sales were made was the price fixed for the sulfanthrene pink by the Du Pont Co.

To establish the price which the producer would have received or was willing to receive it must at least appear that he had something to sell at that price, and also that he had or could produce enough to sell, so that more than two small orders could be filled without exhausting the supply, in a case where the demand was as great as in this case. If this is not so, the mere declaration of a possible producer that he was willing to sell at a named price would enable him to compel an appraisal at a value which did not then exist and might never obtain. In other words, without having anything to sell, without knowing what it would cost to produce the article, he could by mere fiat control, to some extent, at least, the course of commerce.

We are satisfied that there is in the record no competent substantial evidence to support a finding that Sulfanthrene Pink F. F. Paste was freely offered for sale to all purchasers at the time the merchandise here was exported, which, under the rule of the Sandoz Chemical Works case, *supra*, is indispensable in this case to the application of subdivision (f).

The judgment of the Board of General Appraisers (now the United States Customs Court) is, therefore, *reversed* and the case *remanded* with *direction* to affirm the judgment of the single general appraiser.