HUDSON SHIPPING CO., INC. *v.* UNITED STATES (No. 4844).[1]

---

[1] C. A. D. 604.

20

United States Court of Customs and Patent Appeals, December 8, 1955

Michael Stramiello, Jr., for appellant.

Geo. Stephen Leonard, Acting Assistant Attorney General, Richard E. Fitz-Gibbon, Chief, Customs Section (Daniel I. Auster, trial attorney, of counsel), for the United States.

Barnes, Richardson & Colburn (James F. Donnelly and Albert MacC. Barnes of counsel) amicus curiae.

[Oral argument October 6, 1955, by Mr. Stramiello, Jr., Mr. Auster, and Mr. Donnelly]

Before O'Connell, Acting Chief Judge, and Johnson, Worley, and Cole, Associate Judges

Cole, Judge, delivered the opinion of the court:

In this case we are asked to determine the elements of the "American selling price" formula for valuation of imported merchandise, and the nature of proof necessary to prove non-existence of such elements in a case where that method of valuation is specifically directed in the tariff act. The involved merchandise consists of two importations of phthalic anhydride, a coal-tar product provided for *eo nomine* in paragraph 27 (a) of the Tariff Act of 1930 with both a specific and an ad valorem duty. The dates of exportation of the shipments were October 12, 1949, and November 16, 1949, respectively. Upon entry the appraiser in each case valued the merchandise at 21½ cents per pound upon the basis of "American selling price" as defined in section 402 (g) of the Tariff Act of 1930 as amended. Use of American selling price valuation for any of the products listed in paragraph 27 is dictated by paragraph 27 (c) whenever a similar competitive product is produced in the United States. On appeal in reappraisement, though not denying that a similar competitive product was produced in the United States, the importer sought to prove that on the dates of exportation of each of the shipments there

existed a market condition for the domestic product which made it impossible to find an "American selling price" which met the definition of the statute.

The trial judge in his decision, 31 Cust. Ct. 419, Reap. Dec. 8266, held that importer had failed to make out a *prima facie* case that there was no American selling price on the dates in question, and therefore the valuation of the appraiser was allowed to stand. The Second Division of the United States Customs Court affirmed the trial judge, 33 Cust. Ct. 602, A. R. D. 53, and importer appeals to this court.

A brief word is necessary as to the scope of review permitted us in cases of this kind. Our jurisdiction in reappraisement cases is limited to questions of law only. 28 U. S. C. 1952 ed. § 2637. As we read the decisions below, their holding is that importer has failed to make out a *prima facie* case, and the so-called findings of fact are only a statement of the legal consequences flowing from such a holding. Of course, if there had been actual findings on disputed issues of fact, we could not reverse unless there was no substantial evidence to support the findings. *Kobe Import Co.* v. *United States*, 42 C. C. P. A. (Customs) 194, C. A. D. 593; *United States* v. *Nelson Bead Co.*, 42 C. C. P. A. (Customs) 175, C. A. D. 590. In the view we take of this case, it is not necessary to decide whether the finding below was strictly one of law, or whether it was also one of fact. For our purposes, we shall assume that the holding was solely that importer had failed to make out a *prima facie* case, which is, of course, a question of law, and in the resolution of which plaintiff's evidence is presumed true, and is looked at in the light most favorable to it. See *Schad* v. *Twentieth Century-Fox Film Corp.*, 136 F. 2d 991. Compare *United States* v. *United States Gypsum Co.*, 67 F. Supp. 397; *Howard Industries* v. *United States*, 115 F. Supp. 481.

As stated above, phthalic anhydride is specifically provided for in paragraph 27 of the Tariff Act of 1930. Subdivision (c) of that paragraph provides as follows:

(c) The ad valorem rates provided in this paragraph shall be based upon the American selling price (as defined in subdivision (g) of section 402, Title IV), of any similar competitive article manufactured or produced in the United States. If there is no similar competitive article manufactured or produced in the United States then the ad valorem rate shall be based upon the United States value, as defined in subdivision (e) of section 402, Title IV.

Section 402 (g), to which reference is made in the foregoing quotation, reads as follows as amended by the Customs Administrative Act of 1938, 52 Stat. 1081:

(g) AMERICAN SELLING PRICE.—The American selling price of any article manufactured or produced in the United States shall be the price, including the cost of all containers and any coverings of whatever nature and all other

costs, charges, and expenses incident to placing the merchandise in condition packed ready for delivery at which such article is freely offered for sale for domestic consumption to all purchasers in the principal market of the United States, in the ordinary course of trade and in the usual wholesale quantities in such market, or the price that the manufacturer, producer, or owner would have received or was willing to receive for such merchandise when sold for domestic consumption in the ordinary course of trade and in the usual wholesale quantities, at time of exportation of the imported article.

Since it is not disputed that a similar competitive product is produced in the United States, the language of paragraph 27 (c) would seem automatically to require that value be determined by the "American selling price" formula. The wording of that paragraph does not seem to contemplate any circumstances under which there would not be an American selling price where there was an identical domestic product. As we said in *Kuttroff, Pickhardt & Co.* v. *United States*, 12 Ct. Cust. Appls. 299, 305, T. D. 40313, speaking of an identical provision in paragraph 28 of the Tariff Act of 1922:

* * * Paragraph 28 does not require a finding or proclamation by the President and clearly provides *without limitation or reserve* that if there be a competitive article, the rate of duty shall be applied to the American selling price as defined in subdivision (f) [now subdivision (g)] of administrative section 402. [Italics added.]

In such circumstances, it does not seem too much to insist that importer offer evidence to negative, or tend to negative, every possible way by which appraiser might have arrived at an American selling price which would meet the definition of the statute.

The evidence may be summarized as follows. The president of the importing firm testified that he was familiar with market conditions for phthalic anhydride; that there were five major producers of the product in the United States; that in October, November, and December, 1949, he communicated with four of these companies by letter and telephone relative to purchasing phthalic anhydride from them; that the fifth major producer was not producing phthalic anhydride during that period because of an explosion at their plant, and that in fact he sold imported phthalic anhydride to that producer in October through December, 1949; that none of the producers contacted by him offered to sell importer any phthalic anhydride during October, November, or December, 1949; that due to a steel strike (which reduced the supply of naphthalene, the raw material from which phthalic anhydride is made), and the explosion at the factory of one of the major producers, he found domestically-produced phthalic anhydride in extremely short supply in the involved period.

Carbon copies of the letters sent to the four major producers and the replies thereto of three of them were introduced in evidence. The

inquiries, all dated October 25, 1949, were identical, and so far as pertinent read,—

We would appreciate your letting us know what your earliest delivery time would be for the supply of 1 or 2 carloads of PHTHALIC ANHYDRIDE.

Two of the replies, one dated October 28, and the other November 10, 1949, were substantially to the effect that the manufacturers were not presently in a position to supply the material, one letter stating that phthalic anhydride "is still in very short supply with us, and the best we could do would be to reconsider your inquiry in mid-January." The third reply stated:

We are pleased to confirm our telephone quotation of November 2, 1949, namely, 21½¢ per lb. f.a.s. New York or Philadelphia, preferably Philadelphia on material of U. S. A. origin. * * * [A]s indicated during our telephone conversation, the present indications are that we could supply you with one or two carloads of the above mentioned material during December 1949. The price quoted above is subject to change without notice and the prospects of delivery depends upon our production schedules on receipt of your orders.

The witness stated that he could not find a reply from the fourth company, and could not remember whether there had been one, but that there had been a telephone conversation on the matter, and that he did not buy any phthalic anhydride from that company.

A letter received by a company other than importing firm from one of the three major producers which had replied to importer's inquiry was also introduced in evidence. Under date of December 5, 1949, answering an inquiry of December 1, 1949, the letter stated:

Present price for this quantity is 22½¢ per pound, f. o. b. Buffalo, freight equalized with nearest competitive producing point.

We are unable to indicate delivery dates at present. Meanwhile, we would appreciate having you advise us whether this material is for your own consumption, or for resale.

A letter received by still another firm from the fourth major producer (which did not reply to importer's letter) is also in the record. Under date of November 10, 1949, the letter states, "Your recent inquiry for Phthalic Anhydride is appreciated, but we are not in a position to offer as we are fully committed for our entire production."

A customs examiner in the office of the appraiser of merchandise of the Port of New York testified that he had requested and received a report from customs agents of market conditions of that product for the period October 1 through December 31, 1949. This report was neither placed in evidence nor was its production requested; neither is there any inkling of its contents. The examiner also testified that he personally had spoken with representatives of four major producers who said that each of their companies during October, November, and December, 1949, was delivering phthalic anhydride

only on contracts previously made, and that they were not able to deliver the full amounts called for by such contracts; and that their merchandise was going only to contract customers who had contracts for a year's requirements.

Certain excerpts from trade journals are also in the record. These excerpts, bearing dates of publication in October or November, 1949, state that the supply of phthalic anhydride was "still very short," and "continued tight during the past week," and the producers "were not able to satisfy the market" and "were reportedly unable to meet all demands." At the same time it was stated that the "price of the material held to previous levels," and the "[p]rices of phthalic anhydride have remained stable."

Certain statistics compiled by the United States Tariff Commission, which tend to show that domestic production was less in 1949 than in 1948, while imports were substantially higher, are disclosed. The probative weight of this evidence seems insignificant, if for no other reason than that the figures are for full calendar years, and not for the period involved here. However, counsel for the Government showed by the same authority that the Tariff Commission listed nine domestic producers for phthalic anhydride, although the quantities each produced or sold is not shown. The statistics show also that phthalic anhydride is produced in substantial quantities in the United States, the sales for 1949 totalling over 117 million pounds, at a value of more than 24 million dollars.

The question before us is whether the Customs Court erred in holding that the evidence summarized above was insufficient to make out a *prima facie* case that the "American selling price" formula could not be applied. It will be observed that all of appellant's evidence is directed toward proving that there was no "price * * * at which such article is freely offered for sale to all purchasers * * *." None of the evidence bears on the question of whether there was a "price that the manufacturer, producer, or owner would have received or was willing to receive." Whether appellant had the burden of offering evidence on this last point will be discussed later. First, did appellant make out a *prima facie* case that there was no price at which phthalic anhydride was freely offered to all purchasers? We do not believe that it did, and the decision below may be upheld on that ground alone.

We may accept as true appellant's assertion that failure or refusal or inability to offer the material to even a single purchaser constitutes a failure to freely offer to *all* purchasers. It does not follow, however, that all *producers* must be freely offering to all purchasers. Certainly it would be sufficient if just *one* producer were freely offering to all purchasers. In *Sandoz Chemical Works* v. *United States*, 13 Ct. Cust.

Appls. 466, it was held that one domestic producer could establish a freely offered price to all purchasers, even though no actual sales had ever been made. The main point in the argument of appellee is that the evidence shows that there are producers other than those discussed by appellant, and therefore that appellant has not negatived the possibility that one of them was freely offering phthalic anhydride to all purchasers. Of course, it may be added that there seems to be no good reason to limit those who could make a free offer to producers alone. The *owner* of phthalic anhydride, though not a producer, could presumably make a free offer to all purchasers.

It may be argued, of course, that proving the situation of each and every producer and owner is an insurmountable task, and one not required by the law, and that proof of the situation of the *major* producers is sufficient to raise a rebuttable inference that the situation is the same with the other producers and owners. So we understand appellant to argue. Such an inference is of course a permissible one in certain circumstances, but the realities of economics militate against it here. Appellant has attempted to prove that there was an abnormal market situation where the demand exceeded the supply. The fallacy in appellant's reasoning is the assumption that there is a single quantitative demand. Demand is always a function of the price, and fundamental rules of economics dictate that where the demand exceeds the supply and there is no interference with the market, that the price rises until the demand diminishes sufficiently to equal the supply. It stretches credibility to the breaking point to infer, from the evidence presented here, that not one owner or producer was freely offering phthalic anhydride for sale at *some* price to all purchasers, particularly here, where the annual production is in the hundreds of million pounds per year. It makes no difference so far as the wording of this part of the statute is concerned that this "freely offered" price might have been substantially higher than the price being received by the producers under their outstanding contracts. See the *Sandoz Chemical* case, *supra.* The logical inference where demand exceeds the supply at a given price is not that there is no freely offered price, but that the freely offered price to all purchasers is probably a higher price. For these reasons, proof that the so-called "major producers" are unable to supply all demands at their price does not raise a permissible inference that *no one* having control of the product is freely offering it to all purchasers at a price where the demand does not exceed the supply. (We may note parenthetically here that we do not hold that such higher price is necessarily the American selling price as defined in section 402 (g). The meaning of the second part of that section will be discussed *infra.*)

Thus, we hold that, in order to make out a *prima facie* case that there was no price at which phthalic anhydride was freely offered to all purchasers (under the conditions of this case) appellant had the burden of producing evidence tending to show that not one producer or owner of phthalic anhydride was freely offering the product to all purchasers at any price. It may be argued that this places a practically impossible burden upon the importer. The short answer is that he is trying to prove a practically impossible situation. One way the burden might be met is by offering evidence of a monopolistic control, but no such evidence has been introduced here. In an economy where the profit motive rules, where there is no monopolistic or Governmental price control, and where a substantial supply of a fungible is in the hands of those who can make such disposition of it as they may choose, the odds overwhelmingly favor the existence of some price at which the material is freely offered to all purchasers willing to pay that price. However, if there is evidence of monopoly or of price control or of discrimination, then the free market cannot be assumed. But where, as here, the evidence shows no tampering with the conditions for a free market, the only permissible assumption is that there is a free market price, i. e., a price at which the product is freely offered to all purchasers. Thus we hold that importer had the burden of introducing evidence tending to prove that *no* producer or owner of phthalic anhydride was freely offering it for sale at any price, *or* that there was some interference with economic conditions which prevented application of the law of supply and demand. Neither branch of this burden has been met in this case.

Furthermore, we may note that even the proof offered with regard to the situation of the five major producers is far from satisfactory. In no case were the books of the major producers offered in evidence, nor were representatives of such companies called to testify, nor was it established by any competent evidence that it was impossible to do so. Rather, letters and hearsay statements were received in an attempt to indirectly prove the conditions then existing. The question of the admissibility of this evidence is not before us, but the question of the proper inferences to be drawn therefrom is. We note that the solicitations made by the importing firm were apparently understood as inquiries as to sales for *export* and not for domestic consumption. In answer to a question from the court as to whether he had ever bought phthalic anhydride in the United States, the author of the letters replied, "Only when it was available for export." The letters in reply seemed to have understood the solicitation as one for export, since two of the letters originated in the "Export Sales" departments of the firms, and one of them quoted an "f.a.s." price. By the 1938 amendment, the words "for domestic consumption" were inserted into section 402 (g), clearly indicating that the situation

with respect to sales for export was not to be considered in determining the American selling price. With this evidence being disregarded as not pertinent, little remains of plaintiff's case but a patchwork of data not correlated as to time.

We must note also that with regard to the first shipment here involved, which was exported on October 12, 1949, that there is no acceptable evidence at all which would tend to show the market conditions on the critical date. The only evidence which comes close to that date are some general statements as to conditions in "October, November, and December, 1949." We do not regard such statements as substantial with respect to proving conditions as of October 12, 1949.

One additional topic remains for discussion. It has been appellant's contention in this case that it would make out a *prima facie* case by showing that there was no "price * * * at which such article is freely offered for sale to all purchasers." It is stated in appellant's brief that:

The presumption of correctness of the appraiser's finding of value in the instant case implies that he found existing each and every condition set forth within Section [402] (g) which defines American selling price. Thus the implication is that the appraiser found, among other things that on the dates of exportation of the merchandise under consideration, domestically produced phthalic anhydride *was being freely offered for sale* for domestic consumption to all purchasers in the principal market of the United States, in the ordinary course of trade and in the usual wholesale quantities. [Italics quoted.]

The above-quoted statement completely overlooks the fact that two *alternative* methods of arriving at the American selling price are listed in section 402 (g). In addition to the freely offered price, there is "the price that the manufacturer, producer, or owner would have received or was willing to receive." This court has many times recognized this fact. In *United States* v. *General Dyestuff Corp.*, 19 C. C. P. A. (Customs) 410, T. D. 45577, speaking of section 402 (f) of the Tariff Act of 1922 (the predecessor of section 402 (g) of the present act), we said:

It will be noted that said section 402 (f) establishes two methods by which the American selling price of an article may be fixed: First—

the price * * * at which such article is freely offered for sale to all purchasers * * *;

second—

the price that the manufacturer * * * would have received or was willing to receive for such merchandise when sold in the ordinary course of trade. * * *

Likewise, in *Kuttroff, Pickhardt & Co. (Inc.)* v. *United States*, 14 Ct. Cust. Appls. 176, T. D. 41698, we said:

We are not unmindful of the breadth and scope of the language used by Congress in defining the American selling price. Presumably Congress, in using

the language, "or the price that the manufacturer, producer, or owner would have received or was willing to receive," contemplated an American producer of a coal-tar product who had something to sell and deliver but who, for some reason, had not done so or possibly could not do so.

Just how the appraising officials are to determine how much the American producer "would have received" or how much he was "willing to receive" is not suggested in the statute. It is presumed that he would have received and was willing to receive the price at which he freely offered it for sale, etc., but Congress must have had in mind a price other than that which is created by an offer to sell, since it mentioned two prices.

Appellant may have been misled by certain language in *Kuttroff, Pickhardt & Co.* v. *United States*, 13 Ct. Cust. Appls. 17, and *Sandoz Chemical Works* v. *United States, supra,* in which it was held that the Customs Court should make findings of fact on each element of the American selling price definition. The context in which such language appears, however, makes it clear that American selling price can be established by proof of the freely offered price; or by proof of the price that a domestic producer, etc., would have received; or by proof of the price that a domestic producer, etc., was willing to receive. In the *Kuttroff* case (13 Ct. Cust. Appls. 17, 21) we said:

An analysis of this subsection demonstrates that to establish this American selling price, certain basic facts must be shown, as follows:
First. The price of goods and containers, and other costs ready for delivery.
Second. The price at which such article is freely offered for sale to all purchasers.
Third. The price in the principal market of the United States.
Fourth. The price in the ordinary course of trade.
Fifth. The price in the usual wholesale quantities.
Sixth. The price at time of exportation.
*Or it may be established by the following alternative proof:*
First. The price the owner, etc., would have received, or,
Second. The price the owner, etc., was willing to receive: (*a*) When sold in the ordinary course of trade. (*b*) When sold in the usual wholesale quantities. (*c*) At the time of exportation.
From a consideration of said subsection, it does not seem essential that the goods must be sold, *but is sufficient if the owner of them would have been willing to take a certain price for them if he had offered the same for sale.* [Italics added.]

If American selling price may be established by alternative findings, then, in this case, appellant has not made out a *prima facie* case unless he offers evidence tending to negative the existence of each alternative. The presumption is that the appraiser has found facts that would support an American selling price valuation. If importer should prove that there was no freely offered price, the inference is not that the appraiser acted incorrectly, but that he found that there was a price the American owner would have received or was willing to receive. Not until importer presents evidence on this point also does he establish a *prima facie* case.

But the question arises, what is meant by the price that the producer, manufacturer, or owner, would have received or was willing to receive? This court has never had a case before it when it could fully

consider the meaning of this part of section 402 (g). We have, however, strongly indicated that the provision would not be interpreted to mean that firms or persons having monopolies could control the statutory American selling price by factitious transactions. *Kuttroff, Pickhardt & Co.* v. *United States*, 12 Ct. Cust. Appls. 299, T. D. 40313, emphasizes this view as do several other cases. Other cases have held that more than a few hundred pounds must be produced before it could be said that there was even a competitive American product. *Kuttroff-Pickhardt & Co. (Inc.)* v. *United States*, 14 C. C. P. A. (Customs) 381, T. D. 42032. But in this case, there is no evidence of factitious offerings and it is undisputed that the domestic industry is a substantial one, so these cases are of no help.

In order to understand what Congress meant by the language it used, it must be remembered that many of the products described in paragraph 27 are what are known as coal-tar intermediates, that is, they are not used for themselves, but are used in the manufacture of other end products. In such a situation there must be many occasions in which an American manufacturer produces one of these products, not for sale, but to use himself in the production of other end products. Indeed, in this case, though not of evidence, counsel for importer have told us that the producers other than those discussed in the testimony produced only for their own consumption. Where all production is for the manufacturer's consumption alone, it may well be that there is no freely offered price.

It is probable that Congress wished also to protect these producers in the intermediate stage, as well as in the final stage. If it did not do so, then it is unlikely that there would have been any American company which produced both the intermediate and the end product, inasmuch as they could have bought imported intermediates more cheaply than they could have manufactured it. Viewed in this light, the language used by Congress seems quite understandable. By allowing the American selling price to be assessed on the basis of the price that the American producer would have received or was willing to receive, protection would be afforded to the American producer who was not offering the product for sale, but was using it himself. By assuring the domestic manufacturer that a competitor could not undersell him on the final product by importing the intermediate at a price less than the domestic manufacturer could make it, Congress encouraged the American manufacturer to enter into the construction of factories to produce the intermediates.

Thus, as we construe section 402 (g), it defines not only the *price* in the market of American produced goods, but also the *value* of those goods where not sold under open market conditions. It may be asked how one could find the price that the American manufacturer would have received or was willing to receive. We do not construe the words

"would have received" so that they mean the same as "was willing to receive" for that would make the statute unnecessarily redundant. We feel that the price that the producer would have received means the price that would *have been* received had the item been placed on the market. In this meaning, the wording is the equivalent substantially of "reasonable value," and there are no serious difficulties in finding such a value. The procedure would be somewhat similar to that used in the *Sandoz* case, *supra*, where there was a domestic manufacturer of an intermediate who had never sold any of the intermediates. In determining whether or not the price at which the company had listed itself as offering the product was arbitrary, the court compared the cost of the finished product with the cost of the intermediate, and found that it was reasonable. In the same way, one could find the price that the manufacturer would have received, or was willing to receive, by computing the cost of production, and allowing a reasonable profit, or by finding the price of the final product and making a suitable deduction, or by comparing the price received in sales of the intermediate (1) not in the usual course of trade, or not freely offered to all purchasers, or not in wholesale quantities, etc., or (2) not domestically produced. Certainly, if an identical foreign product is sold in the United States, the price that would have been received by the American producer when and if he sold his product would have been no more than that of the foreign product. (This price would not be the same as the "United States value" as defined in section 402 (e).)

In this case, from the evidence introduced, it seems clear that the appraiser would have had no difficulty in determining the price which the American producers not shown to have sold their production "would have received" or were "willing to receive." As a basis he had the price that was being received upon valid contracts by the "major" producers, the price that was being quoted for future delivery by one of the major producers, and the price at which the foreign product was being sold. The appraiser would have been justified in using any of this data in finding the price the American producer or owner would have received had he placed his product for sale. Since appellant has offered no evidence tending to negative the possibility of a correct American selling price appraisal under the second part of section 402 (g), it follows that he has not overcome the presumption of correctness attaching to the appraiser's valuation, and has not made out a *prima facie* case.

In construing the effect of section 402 (g) and of paragraphs 27 and 28, it must be remembered that the wording of those provisions originated in the Tariff Act of 1922. As we said in the *General Dyestuff* case, *supra*:

Paragraph 28 should not be so narrowly and technically construed to take from it the effect which the Congress, in enacting it, evidently intended it to have.

Following the period of the World War, in an effort to build up and protect the dye industry of the country, the "Dye and Chemical Control Act, 1921," 42 Stat. 18, was enacted. This act declared an embargo upon foreign-made coal-tar dyes and intermediates for a stated period. Following this period, paragraphs 27 and 28 were inserted into the Tariff Act of 1922, which declared a virtual embargo for a 2-year period upon coal-tar products, followed by an American selling-price valuation. The obvious purpose of these paragraphs was to protect the domestic manufacturer of coal-tar products against similar competing foreign products, so that the domestic industry might become established.

No one who refers to the majority reports of the Committee on Ways and Means of the House of Representatives and the Finance Committee of the Senate upon H. R. 7456, which afterwards became the Tariff Act of 1922, can fail to be impressed with the concern of both houses of the Congress in this matter.

We do not find it necessary to discuss the debates that took place in Congress on these paragraphs, and the question of whether *all* products should be subject to American valuation, nor to discuss the bill as it was originally passed by the House with its American valuation provisions. Suffice it to say that appellant's interpretation of the statute, which would deny to American manufacturers the protection of an American selling price valuation whenever there was a temporary fluctuation in market conditions, is clearly contrary to the intent Congress had in formulating the involved statutory provisions.

For the reasons hereinbefore discussed, the judgment of the United States Customs Court is *affirmed*.

WORLEY, Judge, dissenting:

In my opinion the importer's evidence is clearly sufficient, as a matter of law, to overcome the presumption of correctness of the involved appraisement.