(Reap. Dec. 10121)

WORTHY CHEMICALS, INC. v. UNITED STATES

Entry No. 946385, etc.

(Decided December 12, 1961)

*Florrie L. Wertheimer* for the plaintiff.

*William H. Orrick, Jr.*, Assistant Attorney General (*Morris Braverman*, trial attorney), for the defendant.

WILSON, Judge: These appeals for reappraisement relate to a certain product, invoiced as 2.4 diaminophenol hydrochloride, known as Amidol, exported from England (reappraisement R60/9325, R60/9327, and R60/9328), and from West Germany (reappraisement R60/9326), and entered at the port of New York. Appraisement of the merchandise was made on the basis of American selling price, section 402a(g) of the Tariff Act of 1930, as amended by the Customs Simplification Act of 1956, T.D. 54165, by virtue of the provisions of paragraph 28(c) and (d) of said act, as amended, at $7.50 per pound, net, packed. Plaintiff claims that United States value, section 402a (e), Tariff Act of 1930, as amended by the Customs Simplification Act of 1956, is the proper basis of appraisement and that such values

for the involved merchandise are $2.14, $2.32, $2.12, and $2.14 in each of the respective appeals herein.

The pertinent provisions of the statutes under consideration are as follows:

Section 402a(g), Tariff Act of 1930, as amended by the Customs Simplification Act of 1956:

AMERICAN SELLING PRICE.—The American selling price of any article manufactured or produced in the United States shall be the price, including the cost of all containers and covering of whatever nature and all other costs, charges, and expenses incident to placing the merchandise in condition packed ready for delivery, at which such article is freely offered for sale for domestic consumption to all purchasers in the principal market of the United States, in the ordinary course of trade and in the usual wholesale quantities in such market, or the price that the manufacturer, producer, or owner would have received or was willing to receive for such merchandise when sold for domestic consumption in the ordinary course of trade and in the usual wholesale quantities, at the time of exportation of the imported article.

Section 402a(e), Tariff Act of 1930, as amended by the Customs Simplification Act of 1956:

UNITED STATES VALUE.—The United States value of imported merchandise shall be the price at which such or similar imported merchandise is freely offered for sale for domestic consumption, packed ready for delivery, in the principal market of the United States to all purchasers, at the time of exportation of the imported merchandise, in the usual wholesale quantities and in the ordinary course of trade, with allowance made for duty, cost of transportation and insurance, and other necessary expenses from the place of shipment to the place of delivery, a commission not exceeding 6 per centum, if any has been paid or contracted to be paid on goods secured otherwise than by purchase, or profits not to exceed 8 per centum and a reasonable allowance for general expenses, not to exceed 8 per centum on purchased goods.

Paragraph 28, Tariff Act of 1930, as amended:

(c) The ad valorem rates provided in this paragraph shall be based upon the American selling price of any similar competitive article manufactured or produced in the United States. If there is no similar competitive article manufactured or produced in the United States then the ad valorem rate shall be based upon the United States value.

Plaintiff introduced the testimony of five witnesses. Its first witness, pursuant to subpoena, was Mr. Irving Gertzog, employed by Verona-Pharma Chemical Corp. as assistant sales manager and salesman in the "Intermediates" department of that concern. The record also discloses that he is a chemist and chemical engineer. He testified that he was familiar with the process whereby Amidol is manufactured and that his company manufactures Amidol and does not import it (R. 7–8).

Mr. Martin Jervis, purchasing agent for the plaintiff, which the record shows was in the business of "custom compounding and packaging of photographic chemicals" (R. 19), testified with respect to

the purchase of Amidol by his company for the purpose of fulfilling a Government contract. It appears that some 3,000 pounds of Amidol were required for the latter purpose, which was to be delivered in about 2 months. Plaintiff's witness stated that, in December 1958, after inquiring of several companies with respect to the purchase of the product, he found that only small quantities, one-half pound or a pound at a time, could be procured; that, subsequently, as a result of further inquiry in the trade, he found the Verona company in New Jersey as a supplier of the product, but that the most that the latter company could furnish was about 70 or 80 pounds per week (R. 23–24). It appears that, eventually, on or about February 24, 1959, plaintiff's firm did purchase 500 pounds of Amidol from Verona Dyestuffs, a division of Verona-Pharma Chemical Corp., at $7.50 a pound (plaintiff's exhibit 1 (R. 25)). A letter, dated January 8, 1959, from Verona Dyestuffs Company to Worthy Chemicals, Inc., in which Verona quoted a price of $7.50 per pound for an order of 3,000 pounds, 500 pounds to be delivered promptly, and the balance at the rate of 500 pounds per month, was received in evidence as plaintiff's exhibit 2 (R. 26). Mr. Jervis further testified that the balance of the amount of Amidol, required by the plaintiff, namely, 2,500 pounds, was subsequently purchased abroad from Johnsons of Hendon, England, it appearing that the last entry for such merchandise was April 30, 1959 (reappraisement R60/9326).

The Government introduced in evidence a purchase order, dated February 24, 1959, from Worthy Chemicals, Inc., to Verona Chemicals, Inc., Springfield Road, Union, N.J., covering the 500 pounds of Amidol purchased from Verona Chemicals, Inc. (defendant's exhibit A (R. 35)). Appearing on said purchase order, is the following notation:

This is CONFIRMATION of verbal order placed with your Mr. Valentine Boise.

On cross-examination, Mr. Jervis' recollection of the circumstances surrounding the purchase of the 500 pounds of Amidol from Verona Chemicals, Inc., was hazy to say the least. He could not recall whether he, himself, or some other person signed the order for the goods, nor could he recall the details concerning the delivery of the goods by his concern to the Government. Although, as heretofore indicated, he had previously testified that delivery of this material had to be made by his concern by the end of February 1959, the record discloses that the importations of Amidol from abroad arrived at the beginning of March 1959 (R. 37). In explanation of how, in such case, the contract by his company with the Government could be fulfilled, the witness could only speculate that his company obtained an extension of the contract time.

Plaintiff's third witness was Mr. Edwin Corkhill, associated with Mallinckrodt Chemical Works in the Industrial Sales Division, who stated that he presently exclusively handles for his company the sales and purchases of photographic chemicals in the eastern part of the country. The record discloses that his concern deals generally in photographic chemicals, including hydroquinone, Pictol, which it appears is the trade name for metol and other photographic items. Plaintiff's witness testified that such items are sold to bulk consumers, to repackagers, and to jobbers, distributors in subdivision packages and bulk (R. 39–40). Mr. Corkhill stated that Amidol is a coal-tar product "similar or somewhat like hydroquinone, or Pictol, or metol, as the material is known," and that Amidol is used as are the other named products as a developing agent (R. 41). Subsequently, on being recalled, Mr. Corkhill testified that, in the case of hydroquinone, his company usually sells at wholesale at a quantity of 225 pounds in a drum and usually 5 drums to the order, a minimum roughly of 1,250 pounds; that his company also sells in "subdivision" packages, in 1-pound, 5-pound, 25-pound, and 100-pound quantities, which are sold through distributors for resale to the retail trade; that the 1-pound units are packed 12 to a case, and the 5-pound units are packed 4 or 6 to a case. The witness stated that all of the company's products are sold only at wholesale (R. 80–82). On cross-examination, Mr. Corkhill testified that Mallinckrodt had sold Amidol at wholesale in subdivision packages, 3 pounds to the case (R. 85). He stated that, "normally," 1,000 pounds would not be the usual wholesale quantity in a sale of Amidol. The witness then testified that there is a difference in the uses of Amidol, Pictol, and hydroquinone (R. 87). Although it appears that plaintiff's witness was not too clear in his testimony as to what constituted a wholesale or retail quantity in a sale of Amidol, he considered sales to distributors, in a case or 2-case lot of about 12 pounds each, as sales in "wholesale" quantities.

Mr. Jules Wertheimer, president of Worthy Chemicals, Inc., who holds a B.S. degree in chemistry from Columbia University, testified on plaintiff's behalf that he was familiar with the components of "2.4 diamino phenol hydrochloride" (R. 43), known as Amidol, the merchandise before the court. The witness stated that all organic developing agents have the same components, explaining, in this connection, that photographic developers consist of a stabilizer and an organic developing agent; that the organic developing agents in use in the United States are, firstly, metol, heretofore referred to as Pictol, and also hydroquinone, which Mr. Wertheimer stated is the other agent in common use. Plaintiff's witness further testified that his company uses metol and hydroquinone in all of its photographic chemicals, except in the one case of a so-called dry stabilization bath at missile track-

ing stations, in which instance Amidol is used. Mr. Wertheimer stated, however, that Amidol functions identically with metol (R. 48).

In attempting to establish a usual wholesale quantity for the products claimed by the plaintiff to be similar to the imported Amidol, Mr. Wertheimer testified that he usually purchased metol and hydroquinone in a quantity of 4,000 pounds, approximately in a ratio of 3 to 1, i.e., 3,000 pounds of hydroquinone and 1,000 pounds of metol per week, which quantity, the witness stated, was the usual wholesale quantity (R. 50).

Referring to the purchase by Worthy Chemicals, Inc., of 500 pounds of Amidol from Verona Chemicals, Inc. (defendant's exhibit A), and the purchase of the other 2,500 pounds of Amidol under consideration, Mr. Wertheimer stated that, after being awarded a Government contract, his company was contacted by the Verona company relative to the purchase of Amidol; that the Verona company actually offered the plaintiff 500 pounds of Amidol, which was accepted (R. 53).

On cross-examination, Mr. Wertheimer was vague in answering questions concerning what was the usual wholesale quantity for Amidol but finally stated, after a series of questions, that the usual wholesale quantity for Amidol was "one to four thousand pounds," as opposed to previous testimony that 1,000 pounds are the "minimum" for other developing agents. In this connection, plaintiff's witness testified that his company had never bought from the Verona company as much as 1,000 pounds of Amidol at one time in one delivery (R. 60–62). He then stated he had placed, on behalf of Worthy Chemicals, Inc., about 8 orders of more than 1,000 pounds of the involved product with other suppliers (R. 63).

Referring again to a similarity between metol and Amidol, Mr. Wertheimer stated metol can be substituted for Amidol depending "upon the application"; that, "In a normal developer, if you are trying to bring out a silvery rays, you can use Metol for Amidol." Plaintiff's witness testified, however, that, in the particular application for which his company uses Amidol, one cannot substitute metol for Amidol, nor can hydroquinone be substituted for Amidol (R. 64). Mr. Wertheimer agreed that he did not know whether or not the Verona company manufactures Amidol.

Mr. Leo Capatosto, an engineer in the United States Army, was the last witness called by the plaintiff. He testified that he was familiar with Amidol and that it was used for so-called "stabilization baths, for rapid developing processing." This witness testified that, to his knowledge, the last Government order for Amidol amounted to 3,000 pounds and that, depending on requirements, the orders usually run from 2 to 4 per year (R. 94–95).

The Government also called as its witness Mr. Irving Gertzog, previously called as a witness by the plaintiff. He stated that his

duties with that company involve the normal sales functions of pricing, advertising, research coordination, administrative and managing functions, and straight technical sales effort. The witness testified that he was familiar with Amidol, having sold it himself and having offered such product to the trade, people in the photographic chemical field (R. 97). Mr. Gertzog stated that sales are made pursuant to a pricelist issued by his company and that the largest number of such sales "run under a hundred pounds group." He further testified that, in such category, the price per package is $10 per pound, which, he stated, changed with the quantities sold. Mr. Gertzog stated that, in the period between January and April 1959, his company "had one sale at $7.50 a pound. All the others, the minimum price was $8.00 per pound" (R. 97). Mr. Gertzog then testified that, in his advertising capacity with his company, he had seen and there had been placed in several publications advertising for the sale of Amidol, viz, in the "Oil, Paint & Drug Reporter," where, the witness stated, such advertising repeatedly appeared, and in the "Chemical Week Buyers Guide," and in a further publication, called the "O.P.D. Buyers Guide," commonly referred to as the "Green Book" (R. 100–101). Mr. Gertzog stated that, of his own personal knowledge, he did not know whether the Verona company manufactures Amidol, qualifying this by stating he had not "seen it come through the reactors" (R. 102).

The issue in these appeals is whether the appraised value of the merchandise, based upon the American selling price, section 402(g) of the Tariff Act of 1930, as amended, is correct or whether the proper values for the importations at bar are those claimed by the plaintiff herein in each case. The essence of the claim here made by the plaintiff is that the proper value for the merchandise is not the price at which the Verona company sold Amidol to the plaintiff, but that the prices which the plaintiff paid for Amidol which was imported by it represent the correct prices for valuation purposes.

In appeals of this nature, the plaintiff has the twofold burden of not only establishing that the appraised value is incorrect but also proving that the claimed value is the proper one for valuation purposes, and it is not incumbent upon the Government to prove that the appraised value is proper, until or unless the importer has shown the appraisement to be erroneous and established a different value. *Kenneth Kittleson* v. *United States*, 40 C.C.P.A. (Customs) 85, C.A.D. 502. In connection with its burden, the appealing party must meet every material issue involved in the case, and, if he fails to do so, the value fixed by the appraiser remains in full force and effect. *Brooks Paper Company* v. *United States*, 40 C.C.P.A. (Customs) 38, C.A.D. 495. In my opinion, the testimony adduced, in the case at bar, supports a finding that there was an American selling price for the Amidol

here under consideration, and I am further of the opinion that such evidentiary facts as are established by the record herein are insufficient to overcome the presumption of correctness attaching to the appraiser's finding of value in each case. After reviewing the contradictory testimony in this case as to whether there was a usual wholesale quantity for the involved merchandise, I am constrained to conclude that the product, Amidol, was freely offered for sale, in the usual wholesale quantities in the ordinary course of trade. Plaintiff's witness Wertheimer testified that, in his experience, the usual wholesale quantity in which Amidol is sold was from 1,000 to 4,000 pounds. However, the testimony of this witness would appear to indicate that this conclusion was predicated upon an evaluation of the particular needs of the plaintiff at a given time. While plaintiff's witness Wertheimer testified that he had placed about 8 orders for the purchase of Amidol of more than 1,000-pound lots with concerns other than Verona Chemicals, Inc. (R. 63), this statement is unsupported by any record of such sales to establish the claimed "usual" wholesale quantities. The record further discloses that Mr. Werthemier testified that his company had purchased from Verona Chemicals, Inc., on other occasions than the purchase in 1959, stating, in this connection, "Whenever we have received an order, we contacted Verona Chemical, and took delivery of any Amidol which they saw free to offer us, I believe which was available in the normal course of trade." (R. 61.) Plaintiff's witness Corkhill disagreed that 1,000 pounds was the usual wholesale quantity in which Amidol is sold (R. 86). The fact of the matter is that the Verona company did offer Amidol to the plaintiff concern at a price of $7.50 per pound on an order of 3,000 pounds, the terms being 500 pounds to be delivered promptly and the balance at the rate of 500 pounds per month (plaintiff's exhibit 2). It appears significant to note that while plaintiff's witness Wertheimer testified that 1,000 pounds of Amidol was the "minimum" usual wholesale quantity in a sale of that product, three shipments of 500 pounds are here involved. Although the witness had stated that Amidol was critical merchandise, which he needed immediately, he explained that these shipments were delivered over a period of time, "within a month or two" (R. 63). In this connection, plaintiff has not established, in the present record, the time differential as to the dates when the involved shipments were ordered from the foreign manufacturer and when they were delivered, the record only disclosing confirmations of the sales by the exporters.

Counsel for the plaintiff, in support of the claimed values, directs our attention to the holding of the court in *Kuttroff, Pickhardt & Co. (Inc.)* v. *United States*, 14 Ct. Cust. Appls. 176, T.D. 41698. In dis-

cussing the application of American selling price to imported merchandise, our appellate court therein, page 184, stated:

To freely offer an article for sale within the contemplation of subdivision (f) it should, at least, appear that some reasonable quantity of the offered article was ready or could be produced for reasonably prompt delivery. The existence of the article should be so advertised, mentioned, made known, or called to the attention of potential customers that they might or could learn that it was possible to procure the same. *Sandoz Chemical Works* v. *United States,* 13 Ct. Cust. Appls. 466, T.D. 41365; *Kuttroff, Pickhardt & Co.* v. *United States,* 12 Ct. Cust. Appls. 299. * * *

In my opinion, the facts covering the sale of Amidol by the Verona company to the plaintiff herein are in accord with a free offering of the merchandise. Here, such sale did represent a "reasonable quantity" and "reasonably prompt delivery."

In passing, it may be noted that the plaintiff, in this case, has not negated a finding of American selling price for the imported merchandise under that provision of section 402(g) which refers to the price that a domestic manufacturer "would have received or was willing to receive for such merchandise," when sold for domestic consumption in the ordinary course of trade and in the usual wholesale quantities, at the time of exportation of the imported merchandise, a further burden imposed upon it under the statute.

On the record before me, I find as facts:

1. That the merchandise involved consists of 2.4 diaminophenol hydrochloride, a coal-tar photographic chemical, traded under the designation of "Amidol," exported from West Germany and England in the period from February to April 1959.

2. That the merchandise in question was appraised on the basis of American selling price, section 402a(g) of the Tariff Act of 1930, as amended by the Customs Simplification Act of 1956, T.D. 54165, at $7.50 per pound, net, packed.

3. That the evidence adduced by the plaintiff fails to establish that the appraised values are erroneous or that other values claimed by the plaintiff are correct.

I conclude as matters of law:

1. That the plaintiff has failed to overcome the presumption of correctness attaching to the values found by the appraiser.

2. That American selling price, as that value is defined in section 402a(g) of the Tariff Act of 1930, as amended by the Customs Simplification Act of 1956, T.D. 54165, is the proper basis of value for the merchandise covered by the instant appeals for reappraisement.

3. That such value is the value returned by the appraiser in each case.

Judgment will issue accordingly.